UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| BELINDA BAKER<br>824 Oaktree Court<br>Lebanon, Ohio  45036 | )<br>)<br>) |
| and | ) |
| STARBORNE PRODUCTIONS, LLC<br>824 Oaktree Court<br>Lebanon, Ohio 45036 | )<br>)<br>) |
| and | ) |
| STARBREACHER ENTERPRISES,<br>LLC<br>824 Oaktree Court<br>Lebanon, Ohio 45036 | )<br>)<br>)<br>) |
| Plaintiffs, | ) |
| Vs. | ) |
| BENSALZ PRODUCTIONS LLC,<br>1755 YORK AVENUE<br>APARTMENT 10G<br>NEW YORK, NEW YORK, 10128 | )<br>)<br>)<br>) |
| and | ) |
| EXCEL SPORTS MANAGEMENT LLC<br>ATTN GENERAL COUNSEL<br>1700 BROADWAY 29TH FL<br>NEW YORK, NEW YORK, 10019 | )<br>)<br>)<br>) |
| Defendants. | ) |

CASE NO.  **1:18CV757**

JUDGE _____ **J. BLACK**

**M.J. LITKOVITZ**

**COMPLAINT FOR DAMAGES AND
DECLARATORY RELIEF AND
JURY DEMAND**

2018 NOV -5  PM 3:33

NOW COMES the Plaintiffs, Belinda Baker, Starborne Productions

("Starborne") and Starbreacher Enterprises, LLC ("Starbreacher"), by and through

counsel, and for this Complaint against the Defendants states as follows:

1

## BASIS FOR JURISDICTION

1. Jurisdiction is proper in this case under 28 U.S.C. § 1332, as all three parties are completely diverse and the amount in controversy exceeds $75,000. Thus, this case falls under the Court's diversity jurisdiction.

## BASIS FOR VENUE

2. Plaintiff incorporates herein, as if fully set forth, all the preceding paragraphs

3. Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff has always resided and conducted her business under Starborne Productions and/or Starbreacher Enterprises in Warren County, Ohio.  The principal intellectual property that is the subject matter of this case was created in Warren County, Ohio.  The activities and communications between the parties of this suit were made almost entirely via email and telephone.  A substantive if not majority of the key witnesses are based in Ohio or other states but have connections to Ohio.  The Defendants were attempting to market, solicit and profit from an Ohio resident's business and products. The parties' written confidentiality ("NDA") contract was drafted in Ohio and is controlled by Ohio law. Thus, the venue is proper in this Court.

## PARTIES

4. Plaintiff incorporates herein, as if fully set forth, all the preceding paragraphs

5. Plaintiff, Belinda R. Baker (hereinafter "Ms. Baker") is a resident of Warren County, Ohio.

6. Plaintiff Starborne Productions, LLC/Starbreacher Enterprises, LLC (hereinafter "Starbreacher") are both limited liability companies used by

Belinda R. Baker as her umbrella companies for her television, film, book

publishing and related projects.  They are organized under the laws of Ohio

with a single principal place of business in Warren County, Ohio.

7.  Defendant, BenSalz Productions, (hereinafter "BenSalz") is a limited liability

company organized under the laws of New York with a principal place of

business located in New York City, New York.

8.  Defendant Excel Sports Management (hereinafter "Excel") is a limited

liability company organized under the laws of Delaware with a principal

place of business in New York City, New York.

## STATEMENT OF FACTS

9.  Plaintiff incorporates herein, as if fully set forth, all the preceding paragraphs

10. In 2011, through shared industry contacts, Ms. Baker was introduced to Mike

Skouras, a partner, agent and owner of Defendant BenSalz in relation to her

*Finney the Starbreacher* (hereinafter "*Finney*") animated feature film project

and its associated Intellectual Property (hereinafter "IP").

11. Before connecting with Mr. Skouras, Ms. Baker had created and developed

this property--- after years of hard work and significant personal investment

--and already obtained serious interest in her project from various parties.

One such party, Acrylic Tank Manufacturing (hereinafter "ATM") had entered

into a contract with Ms. Baker to create licensed kids aquariums, inserts and

figurines based on the *Finney* IP and to promote the film on their reality show

"*Tanked*" on Animal Planet and within their business. It was by referral from

Wayde King, CEO of ATM that the Plaintiff was introduced to Skouras, who

was at the time serving as an agent and media representative for ATM.

12. *Finney the Star Breacher* was an extremely well-received, commercially

viable property. Before, and in the years since, the Plaintiff's dealings with

the Defendants, Ms. Baker had acquired interest and support from an array

of film industry professionals, high level talent, potential private investors,

and corporate marketing partners, such as Sea World, Pepsi, Toyota, and

Procter & Gamble, leading conservation icons such as Jack Hanna and Bindi

Irwin, Paul Clark of *Save our Seas Hawaii* and Gregor Hodgson of *Reef Check*,

various TV/film producers, such as Kathy Almon of *MacGillivray Freeman*

films, Donna Peerce and Valerie Gould, author/speaker David Coleman, Sea

World show producer/event director Damon Patai, the late Sally B. Merlin, a

script consultant to Kathleen Kennedy of Spielberg/Amblin Entertainment,

animation producer/director Mark Baldo who has worked for Dreamworks

and Blue Sky, as well as Oscar winning animation director Daniel St. Pierre

(The Lion King, Tarzan, Beauty & the Beast) and many other notable actors.

13. Another longtime supporter of the project was Baker's business associate

and partner; the award-winning animation producer George Johnsen, CEO

of Mammoth Vision in Burbank, California who secured the interest of South

Korean investors to fund up to 50% of the film's $40M budget.

14. After sharing her creative content and details about her team, Mr. Skouras

and his two partners at BenSalz Productions offered to assist Ms. Baker as co-

producers, partners and agents. Mr. Skouras then introduced Ms. Baker to his

business partner, Casey Close; an agent of Defendant Excel and husband of Skouras' business associate and co-worker at Fox News, Gretchen Carlson.

15. On 10/31/2011, Ms. Baker was led to believe by Mr. Skouras that Mr. Close was going to represent her as an agent in regards to the *Finney* project as was affirmed by email and text, and in calls made to Ms. Baker and her associates Gary Rhein and George Johnsen. This commitment was then relayed to ATM.

16. When Ms. Baker enquired as to what the nature of Excel/Mr. Close's services would entail, she was informed in calls and emails that they would partner with and assist BenSalz/Mr. Skouras in finding the funding and shopping the project to all the major Hollywood studios and to procure A-list voice talent, including the superstar sports figures that Mr. Close represented. It was also relayed that he had agreed to represent Ms. Baker as her agent for the *Finney* property. This was affirmed in both word and deed over the next year and a half in calls with Ms. Baker and her colleagues as well as in countless emails.

17. On 11/16/2011, Mr. Close confirmed in email his enthusiasm for the project and that he would be representing Ms. Baker and the project as her agent.

18. On December 20, 2011, Ms. Baker met with the Defendants and their agents at Excel's offices in New York City. At this meeting, Mr. Skouras and Mr. Close discussed her project in detail, solidifying their commitment to working with Ms. Baker and in representing her in the development, financing, production, shopping of, and, hopefully, securing of a financing/production deal and or a high priced sale of Ms. Baker's intellectual property *Finney the Star Breacher*.

19. At this meeting in NYC on 12/20/11, they convinced Ms. Baker to trust them, dropping names of well-known films studios and celebrities that they alleged to know and promised to reach out to, to help them achieve the financing of Ms. Baker's first class animated movie and associated intellectual property.

20. On 12/21/11, Richard Bennett, managing partner of BenSalz, signed a non-disclosure agreement ("NDA") with Ms. Baker and her company on behalf of BenSalz Productions which is attached hereto as Exhibit A.

21. When Ms. Baker first pressed BenSalz to sign her NDA/confidentiality/non-compete agreement, Mr. Skouras and his partners were defiant and dragged their feet, brushing it off as 'nonsense' but then ultimately agreed to sign the agreement, which was subject to the laws of the State of Ohio and retroactive. This crucial contract did not limit nor restrict Baker's remedies in case of any breach and the Defendants knew and had acknowledged the importance of limiting access to her proprietary IP and properly documenting it, obtaining permission before disseminating her property, especially the film script, and providing due diligence in doing so, knowing the potential severe irreparable damage and dire consequences if they failed to do so, and the devaluation of her property that any breach of this contract might create for the Plaintiffs.

22. This agreement required BenSalz and its agents and employees including Mr. Skouras, or any associate or partner of BenSalz, which includes Close/Excel, to keep her product, *Finney the Star Breacher*, confidential. It also required them to properly document and disclose to her details of who, when, where and how submissions took place and that any and all interested third parties

sign and duly execute a written non-disclosure agreement to be provided and obtained by the Defendants *before* sharing any of the Plaintiff's intellectual property.  This stipulation was made quite clear by Ms. Baker in many calls and emails and was accepted by the Defendants as a requisite term of her granting her permission. The contract also required BenSalz and its agents and partners to inform and seek Baker's written permission in advance.

23. Ironically, before asking BenSalz to sign her company's NDA, Ms. Baker was informed by Mr. Skouras via email that one should always be very careful not to share their original story ideas, or any proprietary proposals, or scripts without a nondisclosure agreement as the entertainment industry is a "nasty industry where ideas are easily stolen and you can't trust anybody."

24. Mr. Skouras then went on to promise Ms. Baker that the Defendants and their agents would be most diligent to ensure that the Plaintiff's IP was properly protected.  Further, Mr. Skouras promised he would handle 'obtaining signed non-disclosure agreements from anyone that he and or his partners talked to about Ms. Baker's project or shared any of her IP with'. This was promised and verified via email which Ms. Baker trusted and relied up in good faith.

25. However, ignoring the need for NDAs, Mr. Skouras took it upon himself--or so he claimed-- to 'shop the project around to an array of his contacts' including his "friend" Harvey Weinstein without Ms. Baker's advance knowledge or her permission or a signed NDA. And this meeting with Harvey was only relayed to Baker via a brief email *after* it took place. He also informed Ms. Baker that his 'partner' Casey Close had also been preliminarily 'discussing her project

to his contacts at CAA (the Creative Artists Agency, where he had formerly been employed) and various studios 'to get a feel for their interest level and the project's potential.' But when Ms. Baker expressed concerns about this unprotected activity and pressed for details, and NDAs, she was brushed off and told they were 'following protocol and not to worry' since 'no one steals from that guy!' (as in Mr. Close) and that they would 'provide her a list of all those they'd been talking to along with the requisite third party NDAs.' But like so many things they had promised her, this sadly never happened.

26. An email from Skouras on 10/24/2011 also claimed that notable director Steven Spielberg had been informed about Ms. Baker's project from one of Skouras' own 'inside contacts' at Dreamworks and that he 'knew all about it' and that a copy of Ms. Baker's script had been passed on to Mr. Spielberg via this never-identified contact of Mr. Skouras' and that Mr. Spielberg was "just waiting for the agent, Mr. Close" (whom the Defendants identified as being a close friend of Mr. Spielberg's), to contact him and give him an "official go ahead" to read the script and consider her project. Ms. Baker was thrilled, of course, by this and intrigued but informed of it all after the fact. Further, she never received any evidence that NDAs were signed by any of these people despite having asked the Defendants for this said evidence multiple times.

27. Mr. Skouras also informed Ms. Baker via email on several occasions in 2011 and 2012 that he had shared her IP with his then (self-professed) "girlfriend" Lis Wiehl; a professional author and former *Fox News* legal analyst, without having Ms. Wiehl sign an NDA, hoping to 'get her feedback and or possible

ideas for the project' and to request 'potential collaboration'. This unwanted and unprotected exposure of her IP concerned Ms. Baker as she didn't want nor need another writer's involvement nor to have her IP exposed before the Defendant asked for permission. That Mr. Skouras identified Wiehl (who has since settled a $30M sexual harassment suit against Fox anchor Bill O'Reilly) as his "girlfriend" in his emails strikes the Plaintiff as odd, since according to public records, Wiehl was in fact still married during this time (2011-2012).

28. All of these supposed discussions and interactions involving Baker's project were not covered by NDAs nor was Baker's permission sought in advance.

29. Beginning in January/February 2012, Excel/Mr. Close and Skouras/Bensalz proceeded to actively engage in their roles as talent agents for Ms. Baker and allegedly began shopping her IP to prospective buyers and potential talent. Further, Defendant Excel and its agents assisted Ms. Baker in the creation of a revised pitch package, as well as purporting to have disseminated her scripts and comprehensive proposals to various major Hollywood studios. Also, both Skouras and Close engaged in numerous conference calls with Baker's other associates and business partners and thus engaging in actions as her agents.

30. *Finney the Star Breacher* is a labor of love for Ms. Baker, and as such she has invested a substantial amount of her own time and money in the years before and since meeting the Defendants. This hard work and investment resulted in Ms. Baker producing a script, book, art, animation demo reels, and original business and marketing plans. In other words, Ms. Baker hadn't just written

a movie script, but developed a complete and comprehensive investment

package for the esteemed Defendants to present and pitch to third parties.

31.  *Finney the Star Breacher* is an inspiring children's story about a very gifted

dolphin who embarks on a classic hero's journey with timely conservation

themes.  *Finney* was brought to these Defendants with prior attached voice

talent like Jack Hanna, the Director Emeritus of the Columbus Zoo, the stars

of Animal Planet's *Tanked* TV show, the support and interest from acclaimed

animation producers like George Johnsen and Mark Baldo, the prior studio

interest from Starz Animation, ReelFX and several others, and an array of

major corporate marketing partnerships and many other interested parties.

32. Previously, Baker had provided an extensive array of creative and marketing

materials including a 100 page production bible and investment prospectus,

scripts and DVDs/samples.  These materials were sent to Mr. Skouras for his

review and then shared with Mr. Close and both expressed how 'impressed'

they were with Baker's work. Presumably, these fully-developed materials

were the catalyst to their commitment to the *Finney* team and project and in

representing Ms. Baker.  In fact, Mr. Close had indicated in their NYC meeting

that he believed Ms. Baker's project could become the next "Lion King of the

Seas" a sentiment echoed by Mr. Skouras exciting Baker as the franchise has

earned $8 billion dollars+ and is one of the most profitable films of all time.

33. Being duly impressed by her well-packaged project and its potential to earn

multi-millions in profits, Defendants' confirmed their commitment and, by

assuring her of their access to the Wall Street investor/banking community,

wealthy sports stars, A list celebrities and Mr. Close's contacts at the Creative

Artists Agency, one of the world's top talent agencies, they lulled Ms. Baker

into a false sense of trust and confidence in their ability to quickly secure the

necessary funding and attract a major Hollywood studio to produce her film.

34. The parties' agreement was based on the understanding that the Defendants

would endeavor to use their alleged extensive connections to help package

Ms. Baker's project and get it financed, sold and produced in exchange for a

substantive financial interest in the project. Yet when Baker pressed for more

specifics, especially pertaining to Mr. Close/Excel's expected compensation,

she was told "he was not to be bothered" and that "he would tell us when he

was ready" but also that he was going to "expect the industry standard" for

agents with "something on the back end too" because, as Skouras noted, "that

is where all of the real big money is." She was also told many times by both of

the Defendants that a document with those specifics was "on the way."

35. Mr. Close, being a seasoned, licensed agent in New York, should have fully

understood that talent agents must abide by the laws enforced by the city

and of the state of New York and agents have strict parameters for what they

can be compensated for which does not include 'something on the back end'.

However, the Defendants were quite cagey and aloof about this issue even

when Ms. Baker and her production partner George Johnsen were discussing

with the Defendants the possibly of raising the film's budget from $40M up to

$50M or even up to $80M as that was closer to the going rate at that time for

CG animated feature films being made by the major studios like Disney and

Dreamworks who had, according to the Defendants, 'expressed their strong interest' already.  Thus, it was important for the Plaintiffs to obtain clarity in regards to Casey/Excel's fees and expectations and yet things got even more confusing when Baker pointed out that there are differences in what 'agents' vs 'managers' do and strict laws governing the maximum 'agents' can receive as commissions being capped at 15% of any deals they orchestrate for their clients whereas 'managers' fees can be higher and potentially include equity or other fees and thus the need for clarity (so that Baker and her team could not only update the film's budget if need be but also speak more accurately with other potential investors, studios, buyers, etc.) Confused and concerned by all of this strange, ongoing nebulousness and dodging of her queries, Ms. Baker pressed the matter again (about clarity on Casey's fees and status of her contract) to which Skouras sent her back email on 6/6/2012 indicating that he would 'remind Casey about a management contract' but that she also 'had the percentages correct' as to agency fees for Casey; again blurring the lines (or suggesting a desire for double dipping) and then within the same email proceeded to reinforce the cloud of confusion by saying that he and Casey would 'want a piece of everything; all of the licensing, books, stuffed animals, happy meals etc. just like the deal he was renegotiating for *Tanked* with Discovery' and that the reason why Baker had not yet received clarity from Casey was that he 'kinda wants to wait and see as bids come in before he puts the contract in play!' and that it was 'noble of him' not to be 'shoving contracts' at Ms. Baker. Not only was this unprofessional and sketchy on a

number of levels, it was a stark contradiction to prior emails wherein both of
the Defendants had identified Casey/Excel as acting as Ms. Baker's 'agents'
and that neither would be involved 'if they didn't feel it was worth their time
and didn't intend to make a lot of money off the deal'.  It was not until Baker
pressed the point about potential legal quagmires had the term 'manager'
was ever used by either of the Defendants. None of this confusion, however,
that was of their own doing would change the fact they were representing
Ms. Baker and her IP as her fiduciaries. It is also very clear they were leaving
things nebulous and Ms. Baker in the lurch on purpose since talent agents
must abide by strict parameters and managers cannot negotiate contracts yet
over and over Ms. Baker was told that Casey's role was to lead the charge on
all negotiations for deals with potential studios/distributors, financiers, etc.

36.  Additionally, adding more confusion to the mix, the Defendants enlisted yet
another third party (Jeff Bazoian of Rabo Bank) to act as a de facto 'agent'
without Ms. Baker's prior knowledge or approval and without obtaining any
NDA/confidentiality agreements.  Bazoian was allegedly tasked with trying
to "shop" and discuss Ms. Baker's project with Bruce Berman, CEO of Village
Road Show and as far as Ms. Baker is aware, Mr. Bazoian is not a licensed
talent agent.  However, Mr. Bennett of BenSalz Productions *was* a former
employee of Rabo Bank and close friend of Mr. Bazoian's, who was pivotal in
Rabo Bank providing $1 billion in financing to Village Road Show in fall 2012.

37. Further, Rabo Bank has since been convicted of money laundering. In fact, in
February 2018, Rabo Bank was sanctioned by the Department of Justice for

international money laundering and at this time its retail operations in NYC are still under further investigation. Until recently, Plaintiff was unaware of this bank's troubled past and the possibility there may have been violations of banking ethics, regulations laws or something even more nefarious being set up between the Defendants and Mr. Bazoian (possibly including Berman) entailing the use of her proprietary intellectual property.  In fact, Baker was never provided any clarity as to what Rabo/Bazoian's involvement was to be exactly, nor what he/they would be expecting if anything (ie. title, role, fees) as far as compensation for his/their efforts in having critiqued, pitched and purportedly pushed Baker's script on to Bruce Berman/Village Road Show.

38.  As the Defendants began actively working with the Plaintiff in 2012, they first focused on the creation of a shorter pitch package. (See Exhibit B). This effort largely comprised of Ms. Baker working with a graphics designer who was referred by Excel, which Ms. Baker was responsible for compensating, as well as providing the source materials, expending her time on research and development, and on the writing and editing for the new packet.  This was finished on 5/3/2012. She had also been induced to revise her film budgets, extensive production bible, marketing pitch book, develop a PPM-investment prospectus, create new promotional demo reels and update and reprint all of her materials or create new ones to include the Defendants in such materials and all at her time and expense. The out of pocket costs incurred and value of her time and that of her partners to do these things were in excess of $750K.

39. On 5/9/2012, Mr. Skouras informed Ms. Baker that both Casey Close and himself had signed off on this new pitch packet (that lists them as partners in the project) and that they would be sending said pitch and scripts out the following Monday to Disney, Dreamworks, Sony, MGM, Paramount, Blue Sky, and (purportedly) several other studios and prospects. Though Ms. Baker asked repeatedly, she wasn't included in any calls with these other prospects nor copied on any of the emails or other communications through which her proprietary materials were, supposedly, sent and she received no proof after the fact that her proposals and or her scripts were actually sent to all of the prospects that had been mentioned nor any evidence whatsoever of NDAs ever having been requested or signed by any of these prospects. All she received in confirmation was email from Excel's Client Services manager Stirling Fiss claiming that the pitch packets, scripts and or proposals had been sent out to a few prospects with a list of their email addresses. Once again, standard industry protocol used by most major studios, agents and producers to protect Ms. Baker's IP was ignored as were her requests for more details and the signed NDAs from these various third party recipients.

40. In the interim, through efforts and contacts Ms. Baker had already cultivated on her own, she was notified that there was strong interest from a Canadian animation studio (Arc Productions in Toronto) in producing and partnering on the project. Ms. Baker informed her agents, Mr. Close and Mr. Skouras, of the interest from Arc and put them in touch with her contact there, CEO Jeff Young. A conference call was then set up between all of the parties. Through

Excel, a script was provided to Arc, who then made a bid on the production and partial funding of the film.  Further, as mentioned before Ms. Baker and her associate George Johnsen brought to the Defendants a South Korean contact who was interested in funding 50% of the production of the film.

41. As far as Ms. Baker was aware, no effort was ever made on the part of the Defendants to follow through on these leads. Instead, Defendants allowed these viable leads to languish, as they did with any other connection Ms. Baker provided for attaching talent or providing production or funding.

42. After receiving Arc Productions' formal offer and bid package, Defendant's allowed it to lapse without taking any further action -- other than to tell Ms. Baker to stop asking so many questions and demeaning whenever she did. They did however lead her on, as exemplified in many calls and emails like one sent on 6/18/2012 that they had a 'way to raise the rest of the funds to produce the Finney movie' and would be working most diligently to do so.

43. Concurrently, Ms. Baker invested a great deal of time, money and resources developing an extensive presentation and marketing partnership proposal for Animal Planet/Discovery; the network that airs ATM's *Tanked* TV show. Despite multiple promises to Ms. Baker and the recommendation of Wayde King/ATM to present said proposal to executives at the network, Skouras failed to ever do so. Instead, promotional ideas, creative content and trade secrets were later absconded from said proposal and misappropriated.

44. In multiple emails and calls Ms. Fiss indicated that she or Jaymee Messler another leading Excel agent and CMO who was working with the agencies

NBA and MLB players at that time and had met Ms. Baker briefly in NYC and

was tasked to pursue brand sponsorship, marketing & funding opportunities

would 'reach out to their literary connections' to try to help Ms. Baker secure

a publisher for her book, and or engage another representative to assist Ms.

Baker in her efforts to secure a deal with one of the major publishers like

Simon & Schuster or Random House as they often partner with producers or

studios on their animated films and provide substantial financial advances to

authors and filmmakers to secure novelization and ancillary merchandising

rights for books slated to become films. Ms. Messler was also supposed to

approach Excel's roster of high profile sports stars about voicing characters

and to try to procure corporate marketing partnerships for the film. Despite

Ms. Baker's repeated requests, to her best knowledge, Excel never made any

tangible effort to follow through on any of this nor with any of their other

duties and promises upon which Ms. Baker had trusted and relied.

45.  Similarly, in emails sent by Skouras, he had promised to "talk to his literary

agent" on Ms. Baker's behalf but "would NOT involve her at all" and would

only do so "*if* his contact thought something was there" which, Skouras said,

"I am not sure he will---as kids books do not sell!" This is simply untrue and

nothing more than an insincere and lame excuse. Skouras did not ever name

who this literary agent was and did not obtain an NDA from him or her.

46. After not hearing anything for a while, Ms. Baker checked back in with the

Defendants about the progress of her materials.  In several emails, Skouras

indicated that he felt Ms. Baker was "clueless and unfit for the business" and

that her desire for updates or proof of progress was "nonsense".  Further, he

informed Baker that he would not be as kind to her again and that she would

only hear from him when or if there was "something concrete to report."

47. The verbal hostility by Mr. Skouras was then elevated to the point of physical

threats.  Eventually, he warned if Ms. Baker dared to even "remotely question

him or anyone he brought in to the project" he would "retaliate so hard that

Ms. Baker "would not know what hit her."  Skouras/BSP proceeded to utilize a

pattern of verbal aggression and threats to pull the plug on her project or even

to resort to violence to maintain control over Ms. Baker. In fact, Skouras warned

Baker and her colleague Gary Rhein that they should "ask around because his

'dangerous' reputation speaks for itself".  The use of intimidation like this was

abusive and stressful especially to Ms. Baker. Further, when she indicated that

she and her partner George Johnsen had contacts at many of the same studios

the Defendants professed they'd reached out to, including Village Road Show

and Dreamworks, they just ratcheted up their bullying and control tactics and

became even more evasive and abusive especially when Ms. Baker indicated her

concerns about the slow progress and lack of any tangible results and expressed

her urgency to move the project forward before the conditions and foundation

she had built started falling apart and offers (like Arc & the Koreans) were lost.

And when she indicated that she might need to consider selling her IP or seeking

other help as she needed to see the project succeed and to earn a living, she was

strongly pressured not to take such proactive efforts and to just be more patient.

But her contract with BenSalz was *not* exclusive and it certainly did not preclude

her as the Executive Producer and owner of her own project to do all she could

to get her film produced. Nonetheless, the undue pressure, threats, and duress being placed on her by the Defendants eventually turned into outright hostility and legal threats; including Salzman and Skouras repeatedly saying 'we have a contract and we will sue you!' though they had no justifiable basis nor reason to do so. It was just a way to scare and control her. Skouras also impeded Baker's ability to effectively pursue other opportunities or maintain the interest of the production companies, A list talent, corporations and investors she'd cultivated by failing to communicate whenever he pleased or using vulgarity when he did and failing to disclose vital information she needed while leveling unwarranted threats exemplified by the hostile emails he sent to Ms. Baker and her colleagues saying she couldn't "make a move without him" or she would be 'seriously hurt' and or sued, along with those who might try to help her.

48. After receiving this email, Ms. Baker reached out to Eric Salzman/BenSalz and to Fiss/Excel to express her fears and concerns about Skouras' hostile calls, texts and emails. Mr. Salzman replied to Ms. Baker with a dismissive email assuring her that 'no one was going to hurt her' and that 'sometime people say things in anger' and encouraging her to be more patient; thus trying to placate and made excuses for his partner's threats of aggression. Salzman also urged Baker not to 'do anything rash and sell her IP' assuring her they were working diligently on her project and that neither 'BenSalz nor Casey would waste their time if they didn't see a great financial opportunity in *Finney'* and weren't sure they could achieve the goal of getting the film financed and into production quickly via their many esteemed connections.

49. In a July 9, 2012 email to Gary Rhein, Skouras stated he was 'pissed off' at Ms. Baker (for asking for NDAs and some proof that effort was being made) and for expressing her frustration that her leads were being left to languish and opportunities were being lost. In this scathing and defamatory email, Skouras told Mr. Rhein that Baker had "better hope he did not crush her project right then" and repeated his rant that she "could not make a move without him." Mr. Skouras continued to disparage Ms. Baker saying he was 'done with that woman' and demanding Mr. Rhein "reel her in or we will ALL walk away and tell every studio why we did!" Mr. Skouras then went on to threaten to "kill the project" (and "if she didn't watch out it wouldn't be the only thing'" and that he was going to call Jeff (Bazoian) and Bruce (Berman) to tell them to forget their consideration of her project and would cancel Defendant Casey Close's upcoming calls with them or with her partner George Johnsen. All were hostile moves meant to scare, bully, intimidate and control the Plaintiff. Mr. Close, of course, never made the promised phone calls to George Johnsen or to Bruce Berman and Jeff Bazoian and to her knowledge Mr. Berman was never presented with the Plaintiff's film script by the Defendants as claimed.

50. Shortly thereafter, despite the malicious and manipulative threats, Ms. Baker was informed in a 6/11/2012 email by Stirling Fiss that Dreamworks had received Ms. Baker's materials and 'expressed interest' and that Ms. Fiss or Mr. Close would be following up with them shortly.  Further, Ms. Baker was informed that Bruce Berman had been in receipt of her proposal (through supposedly Jeff Bazoian of Rabo Bank) and was "interested in the project"

and that Mr. Close was going to be "reaching out very soon and calling Bruce Berman of Village Road Show as well as Steven Spielberg and Dreamworks to discuss next steps, etc." (This was also inordinately convoluted and confusing to the Plaintiff, how Dreamworks was just then (May/June 2012) being sent the script and pitch and expressing interest, since over and over, going back to fall 2011 Skouras spoke of how he had already funneled the *Finney* script thru his contacts at Dreamworks and how there was such strong the interest from Spielberg who was just waiting on Casey's call to make it formal!)

51. The entire charade and incongruent mélange of misinformation pertaining to Berman/Village Road Show as well as  Spielberg/Dreamworks was ongoing and the information relayed by the Defendants convoluted and conflicting. A case in point was an email sent on 5/23/2012 wherein Mr. Skouras indicated "Village has the proposal and we will follow up w/ them. It went directly to the CEO of Village handed to him by Stirling and the head of Rabo--they are good friends. Same w/ Spielberg/Dreamworks." Then on 5/31/2012 "Just heard from my partner Rich: said he received an email from his contact Jeff at Rabo bank and that he had discussed Finney w/ Bruce at Village. We should expect a call in the next week or so!" But no call or follow through ever came. These and other lies was repeated throughout the summer and into late fall of 2012 wherein I and my colleagues had been told in calls and sent emails indicating the Berman had received (via Jeff Bazoian/Rabo bank) my script and read it and these misleading info went on well into November. Also, Ms. Baker was informed in email Oct 24, 2012 from Stirling Fiss that amongst other things;

Jeff Bazoian (to whom she sent Ms. Baker's script, proposals and other IP via email) that he had forwarded it all on to Bruce Berman of Village Road Show and that Mr. Berman had read the script, liked it, and was interested in the project and that the call between Casey Close and Berman, that was supposed to have taken place in the summer but was delayed to 'scheduling conflicts' was to discuss a monetary commitment and next steps. But Ms. Fiss assured Ms. Baker that this call was imminent. Once again Ms. Baker was promised by the Defendants progress would be made yet sadly it never happened.

52. In June of 2012 having been told by Mr. Skouras that her project was being shopped all over the place, Baker sent an urgent email with a list of concerns and requesting documentation that non-disclosure agreements were being signed before her project was being shared. She also asked for updates as to any feedback or progress with Mr. Spielberg.  Mr. Skouras acted offended by Ms. Baker's outreach, stating basically that "Mr. Spielberg and the three big animation studios" had her work and if she didn't like how Mr. Skouras was doing his job then maybe she "wasn't cut out for the business."  Yet Baker has never seen anything to prove that her project was ever presented to any of these said studios, nor to Spielberg, nor to any other studios or contacts, as the Defendants claimed. She also never saw any proof that any celebrity or sports figures had ever been approached or solicited for their participation.

53.  In an email to Ms. Baker on June 25, 2012, Ms. Fiss promised to have Excel's agent Jaymee "reach out to their corporate marketing partners to gauge their interest in potential funding or sponsorship" and to pursue the leads that Ms.

Baker had been cultivating but who required a licensed agent to present her script and or co-production proposals per industry protocol. Some of these entities included Elton John's film production company Rocket Pictures (for whom Arc Productions produced their film *Gnomeo & Juliet*), Pierce Brosnan (ocean activist who shares mutual friends with Baker) and Natalie Portman (who worked with Baker's associate Jack Hanna on a wildlife documentary and also shares mutual friends) Nick Lachey (from Cincinnati) and Ashley Judd (they both attended UK and share industry connections.) Despite these special connections and Ms. Baker's urgent requests (and Excel's promises in calls and emails to quickly and aggressively pursue these leads on her behalf) nothing was done. The failure to follow up with these companies or provide these prospects a copy of Baker's script is particularly egregious, negligent and suspect, bearing the fact that Ms. Fiss suggested in earlier emails to Ms. Baker that script submissions or any "communications with the studios go through Excel" to provide a perceived "authority" and credibility to such.

54. The end of August 2012 came and went with no developments on Ms. Baker's project being made. Despite being told in many calls, texts and in emails that 'great progress had been made' and things were 'going as planned' there was no evidence Defendants had ever followed through on pursuit of the studios or talent nor pursued any individual or institutional investors as promised. Ms. Baker continued to not get any clear answers from the Defendants and the project seemed to be stalled so she suggested that Mr. Close work with her business partner George Johnsen in Burbank to see if they could come up

with a plan to expedite the work on pushing *Finney the Star Breacher* ahead.

She was then informed by Ms. Fiss, and later affirmed by Eric Salzman, that

Mr. Close had in fact spoken to Mr. Johnsen already and that they had come

up with an action plan; namely for Excel to lead the charge in expediting the

securing of the remaining financing through their studio and sports/celebrity

contacts and or BenSalz' banking connections.  When Ms. Baker followed up

with Mr. Johnsen, however, he indicated that he had not heard from any of

the Defendants yet and that said meeting and action plan had not occurred.

55. On 7/16/2012, Ms. Baker received another email from BenSalz stating that

Mr. Close would be 'reaching out to Dreamworks that week' and assured her

once again that a call between Mr. Close and Mr. Berman was imminent and

Defendants were "moving the ball forward" with regards to Baker's project.

56. After not getting any real answers from the Defendants since the previous

month, Ms. Baker reached out yet again and was assured by Ms. Fiss on

8/27/2012 via email that Mr. Close had not rescinded his involvement nor

interest in her project despite receiving numerous emails from Mr. Skouras

stating that "Casey was bailing" and that Mr. Skouras would "contact Rabo

Bank and Mr. Berman himself to tell them to put on hold their review of Ms.

Baker's project!"  In fact, this was a frequent tactic used to control Ms. Baker

whenever she dared ask questions about was happening with her project.

57. On 8/27/2012, Mr. Skouras contacted Ms. Baker to inform her that he heard

back from Disney and that they were interested.  Apparently, Spielberg was

still waiting several weeks on a call from Mr. Close before making the script

consideration official but Mr. Skouras assured her they still were interested.

58. On 8/31/2012 Ms. Baker was informed that Bruce Berman had 'personally'

requested a copy of her script for *Finney the Star Breacher*.  Mr. Berman is an

exceptional industry executive and CEO of Village Road Show, producers of

the highly successful, CG animated film *Happy Feet*.  After being informed of

this, Defendants went back to ignoring and or dodging Ms. Baker's questions.

59. Still not getting any clear answers about how the work or progress was going

on her project, Ms. Baker reached out yet again, at which point Mr. Salzman, a

partner at BenSalz, reached out to Ms. Baker via email and assured her that

everything was 'going as planned', that Mr. Berman had the script and that a

$1 billion credit line had been set up for Village Road Show by Rabo Bank.  On

9/12/12, Ms. Baker was informed by the Defendants that Mr. Berman had

since "read the script and liked it" and was "ready to discuss next steps".

60. Unfortunately, by October 2012 things had really fallen apart between Ms.

Baker and the Defendants.  This is evidenced by a 10/2/2012 email from Mr.

Eric Salzman of BenSalz, wherein he told Ms. Baker that she was "too batshit

crazy for anyone to deal with."  Considering the tenor of that communication,

Ms. Baker reached out to Suzy Figoroa (Mr. Berman's executive assistant who

spoke directly with Bruce Berman). Ms. Figoroa informed Ms. Baker that Mr.

Berman had never received nor read Ms. Baker's script and that there was no

record of *anyone* at VRS receiving her script.  At this point it was Ms. Figoroa

that helped Ms. Baker get her script to Mr. Berman and to Matt Skiena (their

head of development/president of production) and provided Ms. Baker with an email confirmation receipt stating as much.  Shortly thereafter, Salzman sent email to Baker saying she had made a "nice new enemy out of Casey."

61. Mr. Skiena contacted Ms. Baker after actually reading the script and said it was a great project but they didn't think it was right for Village Road Show.

62. Ms. Baker was confused by this response especially after her agents had so persistently talked about Mr. Berman's interest in her project and how much he liked it and her script, when in reality he had never read it. In fact, Village Road Show claims to have never evaluated her script nor heard of her project until Ms. Baker got on the phone and set up a proper review of it herself.

63.  Having been exposed as liars, the Defendants began sending a series of texts and emails to the Plaintiff.  With the Berman lie and fraud exposed, Skouras told Ms. Baker that everyone wanted to walk away from her project and that, in retaliation, they would ruin her name and reputation in the industry -- effectively sabotaging and blacklisting her and her project so it would 'go back to collecting dust'. Mr. Skouras then went on to call, text and email Ms. Baker's other partners and associates and ATM to disparage and defame her further, effectively following through with his prior vicious, hostile threats.

64. At the end of October 2012, Ms. Baker sent an email appeal to Rich Bennett, the managing partner of BenSalz, requesting that he intercede to stop the harassment, threats, deceit and hostility hoping BenSalz would start fulfilling their contractual obligations.  She requested action and documentation.

65. Finally, in November 2012, Mr. Skouras made several hostile phone calls and sent emails to Ms. Baker and to her associate Gary Rhein to inform them that her project was 'dead' and that he was 'killing' her project, and he would be letting every studio know his opinion of her.  Specifically, that she was 'unfit for the film industry', 'a clueless, crazy bitch' and a 'complete waste of time'.

66. Initially Ms. Baker was impressed with the grand, convincing promises and perceived prestige of the Defendants.  This was due in part to the names the Defendants kept claiming they had access to and with whom they promised to share Ms. Baker's project to obtain their interest or involvement, including BenSalz's contacts at Fox News, prominent celebrities such as Betty White, Tracy Morgan, Stephen Colbert, Barry Manilow and Justin Bieber, sports superstars like Derek Jeter, Ryan Howard and Tiger Woods, director Steven Spielberg as well as notable TV personality Gretchen Carlson, a close friend and business associate of Mr. Skouras' and the wife of Defendant Casey Close. And yet, after eleven months, there is no evidence that anyone was ever even approached to solicit their participation or measure their interest.

67. The Defendant's multiple breaches of contract and their acts of fraud were egregious and ongoing. They breached their covenants of good faith and fair dealing. They failed to perform their fiduciary duties and did not abide by proper industry protocols in presenting Baker's script/IP nor did they abide by NYC talent agency laws.  Despite the fact that Close/Excel in serving as the lead agents, promised verbally and in email to aggressively pursue talent and procure corporate support via their own clientele and extensive prestigious

networks, failed to obtain *any* NDAs nor attach *any* talent nor secure a single corporate sponsor or private investor, with no evidence that they ever even legitimately made an effort. This shows a complete failure in their duty of care, honesty and loyalty, and a total failure to perform.

68. Bearing the fact that the Excel agency has, to date, negotiated over $3B in contracts and forged multi-millions in endorsement deals for its clients with companies such as Nike, AT&T, KIA, Porsche and Red Bull, and with all the banking and investment connections BenSalz has as veteran traders/stock brokers, hosts of *Monkey Business Blog* and daily guests of Fox News' *Strategy Room* it simply begs credulity that these same Defendants could not manage to attach even one single LOI from any celebrity or corporate entity nor raise a single dollar for the Plaintiff's project. Instead, it seems that neither of the Defendants had any real sincere interest nor honest intent in honoring their promises or contracts, nor helping Ms. Baker manifest her film and fulfill her lifelong dream. They completely failed to perform and have no viable excuse.

69. In fact, it seems Ms. Baker was just being used as a pawn in the Defendants' clandestine plot and being plied with false promises to keep her hopes up as they allowed doors to close and her real opportunities to fall by the wayside while steering her towards Rabo/Village Road Show *only*, since as Skouras admitted in a June 9, 2012 rant via email, "Casey (Close) was going to dump Baker months ago and the only reason he stayed on was there was interest from Village (Road Show)." Essentially admitting they were not aggressively pursuing any and all options for a deal for Ms. Baker's project, as any sincere,

ethical or competent agent or agency would, and that they were making little to no effort to actually pursue or follow up with Disney, Sony, Dreamworks, Spielberg, Arc Productions, the South Koreans or any other viable options.

70. There was, however, an intentional effort to intimidate, scare, disparage and control Ms. Baker and string her along while subjecting her to a barrage of threats to sabotage and 'kill' her project, defame and demean her, ruin her career and cause the tragic loss of her life's dream, and savings which she'd poured into her project, thus destroying her once in a lifetime opportunities.

71. But Mr. Skouras didn't limit his abuse to business issues. Before the parties' initial meeting in New York in 2011, Ms. Baker met Mr. Skouras in the lobby of the Fox News headquarters where he was supposed to lead Ms. Baker to Excel's offices a few blocks away.  Immediately he asked her if she wanted to take a tour of his office but she declined as she was worried about getting to their meeting on time.  So instead they began walking to the offices.

72. During the walk, Mr. Skouras began to engage Ms. Baker in small talk but to her  extreme discomfort that small talk quickly delved into her marital and dating relationship status with comments that she was very attractive and wondering if she ever 'fooled around'.  He then asked if she was traveling alone, how long she was staying in NY and if she didn't like her hotel was 'welcome to stay at his place'

73. Ms. Baker found these questions inappropriate and uncomfortable and tried to put a stop to this behavior by explaining that she was a Christian person of faith, implying fairly bluntly that she did not engage in this sort of behavior.

Mr. Skouras laughed this off, suggesting that being from Ohio perhaps she was naive, and even stated that using one's looks and sleeping around was how many women especially in NY got ahead in the TV/Film industry.

74. When it didn't appear that his unwanted advances were working, Skouras proceeded to move their small talk to the meeting with Mr. Close.  However, when they finally reached the building and entered the elevator to go up to Excel's offices, Mr. Skouras proceeded to forcibly press himself up against Ms. Baker from behind and touching her inappropriately. It was Ms. Baker's impression this could not have been by accident. Despite being put through this horrific, stressful and humiliating ordeal and the impossible position of either confronting Mr. Skouras or his partners right then and there, risking the abrupt end of the project, or simply remaining quiet and enduring the fear, shock, humiliation, outrage and discomfort, Baker was compelled to stay silent and go forward with the meeting with Mr. Close as scheduled. Although she was scared and upset, Ms. Baker had already invested a great deal of time and money into her project and in preparing for the meeting and traveling all the way from Ohio to New York and she felt the meeting with Mr. Close could be a big turning point in her career and for her project. Sadly, she was put in a compromised and vulnerable position as he had instilled fear in her as well as exerting an unspoken message of power, control and authority over her.

75. After the meeting, Mr. Skouras continued to hound Ms. Baker, asking her to 'go grab a drink' with him or meet later for dinner that night or the next to discuss more details of her project.  He also tried to escort her back to her

hotel, asking if he could 'stop by her room later' to discuss their burgeoning

working relationship.  When Ms. Baker turned down all these advances, Mr.

Skouras informed her that she ought to be 'more grateful to him' for having

made the introduction to Mr. Close.  When Baker expressed her discomfort

over his behavior, he brushed off his harassment as just "normal guy stuff."

76. After the New York ordeal, wherein Mr. Skouras' inappropriate conduct and

advances were rebuffed, Skouras's overall behavior and attitude towards Ms.

Baker grew more bitter, hostile, demeaning, sexist, and threatening.  This

included consistent threats to tarnish her reputation in the industry and to

'kill' her project that he was supposedly representing her on as an agent,

partner and co-producer. As a fiduciary, he should have been putting her

interests first and treating her with professional respect, transparency and

honesty, but instead was making sexist, condescending remarks and threats

against both her livelihood and her physical safety and well-being.

77. As the threats became more vicious and frequent, Ms. Baker expressed her

concerns over Mr. Skouras's hostile behavior to her colleagues Gary Rhein

and George Johnsen and more explicitly to her husband, Christopher Dorsch.

She eventually reached out to the Defendants themselves, including Excel

and Mr. Close via his assistant Ms. Fiss in numerous emails, calls and texts

detailing what was happening to her, explaining that she was being bullied

and harassed, pleading that they intervene to protect her.  Then on June 25, a

detailed email was sent to Ms. Fiss by Ms. Baker expressing her dire concerns

over the incessant bullying, threats of retaliation and the inordinate duress

and the emotional and physical stress and pain it was causing her and that she was not only concerned for her well-being and that of her project and life's biggest investment. She detailed in her letter the sexist verbal abuse, the ongoing harassment, the threats and bullying she was being subjected to on account of Excel's partners, Mike Skouras and BenSalz, and asked for Mr. Close's/Excel's intervention.  Sadly, Ms. Baker's outreach to the Defendants fell on deaf ears.  In fact, Ms. Baker reached out multiple times in emails, calls and texts to Ms. Fiss throughout Sept. through November 2012 requesting their help, answers, updates and to express her concerns over Skouras' and BenSalz' abusive behavior and harassment and her concern over the lack of transparency, the contradictory information and the lack of proof one would expect to show that any effort or progress was being made. Ms. Baker also requested that Excel request NDAs from the studios and producers that both they and BenSalz had said they'd shopped her project to and to be copied on the submission emails. Ms. Fiss requested that Ms. Baker provide her a copy of the NDA agreement that BenSalz had signed (that had already bound Excel to its terms as partners of BenSalz in the *Finney* venture) She indicated Excel would also agree to abide by its terms thus making Excel a party to that NDA Ohio based written agreement and yet subsequently failed to abide by it.

78. On 9/17/2012, Ms. Baker even reached out to her business associate Irwin Raymer of ATM to express her concerns about Skouras, her chagrin with the lack of transparency or progress, and her concerns that opportunities she'd worked so hard to cultivate were in fact being squandered and or sabotaged

by Mike Skouras, who was "not showing her any professional courtesy but instead maligning her and threatening to derail her project at every turn".

79. Finally, Ms. Baker called Mr. Close at Excel and left him an urgent voicemail pertaining to her concerns about Mr. Skouras' inappropriate conduct and all of the stress he was causing her, as well as to address all of the inconsistent and contradictory information that she was receiving. Sadly, this call was never acknowledged nor returned.

80. Finally, when Ms. Baker and the Defendants' working relationship ended in Nov. 2012, Skouras contacted Ms. Baker's associate, Gary Rhein, to threaten Mr. Rhein and Ms. Baker warning them he is a 'dangerous and powerful guy' whom they shouldn't have crossed. (See Ex. "C")" Based on his own prior words Skouras made in many calls and emails boasting about his supposed dangerous and 'notorious reputation' and warning the Plaintiffs to 'duck' if he was ever 'pissed off', and the fact that Mr. Skouras has in the past been sued in NY for racketeering, Baker felt he was serious about his ability and intention to inflict severe physical, personal and professional harm.

81. Mr. Skouras also called Ms. Baker at her home office making lewd comments and threatening to 'bury her' if she ever revealed how he'd behaved towards her to any of their mutual contacts especially Wayde King or Casey Close.

82. These horrific comments and hostile threats as well as the loss of her time and money, lucrative lost opportunities, and the significant financial duress caused to her project resulted in Baker going through extreme physical and

psychological trauma impacting her health and well-being and her ability to enjoy her life or focus on her work.

83. Ms. Baker's extreme duress manifested in a variety of mental and physical symptoms including anxiety, severe depression, nausea and vomiting, heart palpitations, headaches and sleep disruptions.

84. Baker took Skouras' threats of physical aggression very seriously and feared for her life, as indicated in a Nov. 2012 email she sent to her husband Chris asking that he preserve the emails, notes and messages she was sending 'in case anything should happen to her.'

85. Since parting ways with the Defendants, Baker has continued to experience interference and disruption in her business efforts on account of Defendants and suffered the lasting impact of the damage to her career, reputation and ruined professional relationships.

86. Then, on April 24, 2018, after Defendants were sent demand letters by the Plaintiff's attorney earlier that month, Ms. Baker received email from BenSalz Productions and Eric Salzman with a nefarious link to spyware/malware. Plaintiff believes that this was an intentional aggressive act on behalf of the Defendants to send a tacit warning and instill fear and intimidate Ms. Baker yet again, as well as to stalk and harass her. Based on the history of the Defendants having previously bullied, criminally threatened, and repetitively harassed the Plaintiffs, receipt of this ominous email has incited great fear and duress and rebooted Ms. Baker's fears of retaliation, causing her extreme

anxiety and the post-traumatic emotional distress from the trauma of years past and the loss and grief it had caused.

87. Plaintiff is now reliving the past trauma of the abuse and duress caused by these hostile Defendants. This email is yet another example of the extreme, outrageous behaviors being intentionally instigated by the Defendants upon the Plaintiff to cause her severe emotional distress, mental trauma and/or physical bodily harm and it is being inflicted upon the Plaintiff with impunity.

88. For the above reasons, Ms. Baker was forced to pursue her options through the legal system and claims the following:

## CLAIM ONE AGAINST BENSALZ:
## BREACH OF WRITTEN NON DISCLOSURE AGREEMENT

89. Plaintiff incorporates herein as if fully set forth all the preceding paragraphs.

90. Plaintiffs and Defendant BenSalz entered into a non-disclosure agreement on 12/21/2011 attached hereto as Exhibit "A" which was specifically identified as retroactive to the beginning of their professional relationship. The parties' nondisclosure agreement is controlled by Ohio law. Therefore, the Statute of Limitations is 8 years.

91. On or about October 2011, BenSalz Productions breached its agreement by sharing Plaintiff's intellectual property with a third party, Steven Spielberg and Dreamworks, without obtaining a non-disclosure affidavit or any other legitimate proof of access or submission from these esteemed third parties as was required by the NDA contract the Defendants had with the Plaintiffs and by not ever disclosing nor identifying who this mysterious friend or 'insider

contact' was at Dreamworks that was given unprotected access to Baker's

script, pitch materials or other IP and managed to 'get it on Spielberg's desk'

92. BenSalz breached its agreement by sharing Plaintiff's intellectual property

with a third party, Lis Wiehl, without obtaining advanced permission nor a

non-disclosure affidavit from said third party per the contract with Plaintiff.

93. BenSalz breached its agreement by sharing Plaintiff's intellectual property

with his third party contacts at Animal Planet/Discovery Channel, without

obtaining permission in advance nor obtaining a non-disclosure affidavit

from said third party(s) after the fact despite her requests and in defiance of

their duties and obligations as delineated in their NDA contract with Plaintiff.

94. BenSalz breached its agreement by sharing Plaintiff's intellectual property

with third parties, Harvey Weinstein and the Weinstein Company, without

obtaining advance permission nor a non-disclosure from said third parties

per their contract and obligations with Plaintiff and by never providing any

clarity, explanation nor formal efforts at follow through in regards to such.

95. BenSalz breached its agreement by sharing Plaintiff's intellectual property

with a third party, Jeff Bazoian of Rabo Bank without obtaining a non-

disclosure affidavit from said third party per their contract with Plaintiff.

96. BenSalz breached its agreement by sharing Plaintiff's intellectual property

with Disney without providing sufficient details on who, when or how the

Plaintiffs IP was shared, what all was shared and without obtaining a non-

disclosure/non-compete/confidentiality affidavit from said third party per

their contract with Plaintiff.

97. BenSalz breached its agreement by sharing Plaintiff's intellectual property
    with MGM, Blue Sky, Paramount and Sony Pictures without obtaining a non-
    disclosure affidavit from said third parties per their contract with Plaintiff
    and without obtaining Ms. Baker's approval and express written consent in
    advance nor did Defendants provide sufficient details of how the materials
    were disclosed, what of her proprietary was shared, with whom or when.

98. BenSalz breached its agreement by sharing Plaintiff's intellectual property
    with TV personality Gretchen Carlson without obtaining a non-disclosure
    affidavit from said third party per their contract with Plaintiff.

99. BenSalz breached its agreement by sharing Plaintiff's intellectual property
    with Bruce Berman of Village Road Show without obtaining a non-disclosure
    affidavit from said third party per their contract with Plaintiff.

100.    BenSalz breached its agreement by sharing Plaintiff's intellectual
    property with a third parties, Jeff Young/Arc Productions without obtaining a
    non-disclosure affidavit from said third party per their contract with Plaintiff.

101.    Due to the Defendants failure to obtain NDAs or provide Ms. Baker
    any other viable proof of submission, Plaintiff's intellectual property has
    been seriously compromised. Baker can no longer assure interested parties
    that her proprietary script, trade secrets and other related IP are exclusive
    thus significantly diminishing its market value and her ability to protect or
    sell her project in the future--especially as a $40 million dollar movie as it
    had once been. The Plaintiff's proprietary product was put at risk (and thus
    all the time and money she had invested into it) and was recklessly exposed

to an array of companies, studios, and individuals making any past, present

or future copyright infringements, conversion of trade secrets, 'knock off'

projects or any other misuse of the IP, greater ease of misappropriation, and

making adequate legal remedies even more costly and difficult to prove or

obtain. It would also make studios adverse to

102.     Because of BenSalz' breach, Ms. Baker and Starborne have suffered

damages in excess of $7 Million Dollars.

## CLAIM TWO AGAINST BENSALZ AND EXCEL: BREACH OF CONTRACT

103.     Plaintiff incorporates herein, as if fully set forth, all the preceding

paragraphs

104.     Plaintiffs and Defendants entered into a contract when the parties

mutually agreed that the Defendants would represent Ms. Baker as her co-

executive producers, partners and or agents, and promised to promote her

project to their and her extensive industry contacts in order to seek the sale,

financing, and or production of her project in exchange for consideration of

a percentage of both the film's budget, in salaries, fees and commission, and

any and all future profits.  BenSalz' contractual obligations to provide their

services as Co-Executive Producers was established by a written agreement

the parties entered with the Plaintiffs on Dec 2, 2011 (see exhibit B) They

agreed to provide 'all services as is regularly associated with Co-Executive

Producers of a first class feature film.' BenSalz also periodically referred to

themselves and promised to serve Plaintiff as he partners and agents.

105.     The establishment of the contract between Ms. Baker and Excel to

serve and represent her as agent and fiduciary was mutually agreed and

affirmed during the parties NYC meeting and by their subsequent actions,

oral agreements and via email communications. Thus, Defendant Excel had

oral, written and implied contracts with the Plaintiff that they breached.

106.     Ms. Baker performed on the contracts as best she could, providing

them with a plethora of leads and fully formed package not just a script.  Ms.

Baker entered the contracts, relying on their promises that they could and

would expedite the completion of a deal in a matter of a few months or at the

very least take immediate action and make their very best efforts to do so.

107.     Ms. Baker provided the Defendants with her own leads including

offers for funding, promotion and production partners and with some of the

voice and musical talent attached.  She also continued to work exclusively on

the *Finney* project (thus forgoing other income earning opportunities) at the

Defendants urging cultivating leads, enhancing and developing the IP (and

incurring additional time and expense to do so), creating new partnership

opportunities then sharing such with the Defendants while they allowed her

viable offers to languish, failed to pursue any leads, and caused her partners

and supporters to become alienated or lose interest while the foundation she

had invested many years building began to wither and crumble beneath her.

108.     Whether the Defendants were capable of getting *Finney* financed and

produced, they were still under a duty to have made best efforts to do so and

to make an honest, vested effort to adequately represent Ms. Baker and her project which they never really even attempted to do in any competent way.

109.    Defendants not only failed to follow through with their end of the contract by not sending Ms. Baker's materials to all the promised contacts, but also failed to follow up with Ms. Baker's own leads and lied to Ms. Baker about what they were doing. They also discouraged her from pursuing other offers that would have at least allowed her to recoup on her investment and earn a living wage and profit from her creative work and years of sacrifice.

110.    Defendant BenSalz repeatedly stated they were going to intentionally tarnish her reputation and her product, and in fact did so; effectually shutting her out from any future consideration by any of the major animation studios.

111.    Defendant Excel repeatedly failed to follow through on their promises and duties as her agent to help package and present her project to any and all potential buyers, financiers and talent, and did not handle her IP with utmost care nor by standard industry protocol or by NYC agency laws. They also did not competently or aggressively represent her and thus materially breached their contract. Excel also vicariously enabled BenSalz' misconduct and their abusive, sexist, retaliatory, heinously threatening, inappropriate behaviors.

112.    Thus, both Defendants materially breached their contracts with Ms. Baker for which she suffered damages.  As they entered into these contracts and engaged the services of their NY based businesses, NY law and a 6 year statute of limitations applies. Baker lost over $1.5m in guaranteed script and producer fees, other lost income and opportunities, the value of her time, costs and materials (over $3m) and all future profits she would have earned off of the Finney movie and its merchandising which easily could have amounted to tens of millions of dollars.

40

113.        Because of the Defendants' conduct, the Plaintiff incurred direct and

compensatory damages in excess of over $7 Million dollars.

**CLAIM THREE AGAINST BENSALZ AND EXCEL:  FRAUD**

114.        Plaintiff incorporates herein, as if fully set forth, all the preceding

paragraphs.

115.        Defendants were allegedly licensed New York talent agents working

on Ms. Baker's behalf as her fiduciaries and professional representatives.

They were conducting their business and manifesting contractual activities

from their businesses in New York. Therefore the law of New York applies.

116.        Defendants represented to Ms. Baker that they had sent at the very

least her script and/or pitch package to a plethora of her and their contacts,

including several major animation studios, Spielberg and Mr. Burman, and

represented they were soliciting talent, investors and sponsors on her behalf.

117.        Ms. Baker justifiably relied on the Defendants' representations that

they had done as such.

118.        Ms. Baker was damaged by said false representations, notably in the

loss of income and opportunities she had cultivated and garnered for herself

prior to, during and after the Defendants' fraudulent and reckless actions. Ms.

Baker and her associates were induced in reliance of the defendants' multiple

ongoing lies to incur significant financial losses, direct and indirect, lucrative

lost opportunities, and the loss of their time, materials, money and resources.

119.     Defendants misrepresented to Ms. Baker multiple times that a more
         formal talent agent and partnership agreement with Excel, and namely Casey
         Close, was on the way when that was false.

120.     Defendants misrepresented that they were following up with Steven
         Spielberg, Dreamworks and Disney who they claimed were interested in her
         project when no follow-up was ever made nor shared with Ms. Baker.  In fact,
         on multiple occasions throughout 2012 and ongoing until November 2012,
         both Excel and BenSalz represented that Ms. Baker's script and or proposals
         were with high level executives at these and other studios and that her script
         was sitting on Spielberg's desk waiting for Mr. Close to contact him about it.

121.     Defendants misrepresented to Plaintiffs that Mr. Berman, who had
         supposedly already been provided a pitch package and extensive proposal
         (sent and or hand delivered via Excel to Rabo Bank's Jeff Bazoian and then
         forwarded on to Berman) had 'received Ms. Baker's script, read it and liked it
         and wanted to discuss next steps with the agents in particular Casey Close'.

122.     In fact, Defendants indicated that Bruce Berman of Village Road Show
         was already committed to funding and or distributing her *Finney* film project
         which Baker was able to verify by mid November 2012 were nothing but lies.

123.     Defendants misrepresented that a call between Close and Berman to
         discuss Village Road Show's interest and future involvement with the project
         was on the books and was going to take place soon. Yet this call, according to
         Village Road Show, had not ever been agreed to nor scheduled.

124.     Defendants misrepresented to Baker that several strategy calls had

been made by Casey Close to George Johnsen. However, Mr. Johnsen has

denied to the Plaintiff that the calls were ever made. Further, Defendants

indicated an extensive concerted effort had been made to work with and

follow up on Mr. Johnsen's offers of support and his industry connections,

and production/funding leads in S. Korea, Burbank and Australia when no

such effort or activity, according to Mr. Johnsen, ever remotely took place.

125.     Defendants misrepresented that Ms. Baker's extensive presentation

and promotional partnership proposal created specifically for Animal Planet-

Discovery Kids, was or would be forwarded to Marjorie Kaplan, Rich Ross,

and or Melinda Toporof or other top execs at the network when it was never

presented at all.

126.     To her best information and belief, Plaintiff asserts the Defendants

also lied about and misrepresented that the extensive, detailed updated

proposals, demo reels, business plans, revised budget and longer detailed

pitch packages/production bibles created at great time and expense to both

Ms. Baker and her partners George Johnsen, Damon Patai and Gary Rhein,

had already been or would be distributed to an extensive list of potential

private investors, hedge funds, Wall Street investors, celebrities or other

contacts provided by the Plaintiffs (along with leads from ATM) and that a

list that was supposedly being put together by BenSalz and Excel.

127.     Defendants indicated in a July 2012 email from Eric Salzman "Casey

had been in communication with Arc Productions & Jeff Young so he would

know that his proposal and bid in producing and investing in the film was being given 'proper attention' and that 'Casey will be reaching out to Arc and Dreamworks this week'.  By information and belief, there was no such call between Mr. Young and Mr. Close nor was there any further effort at follow up made with either of these studios by either Mr. Close or the Excel agency.

128.     Plaintiff is entitled to damages sustained as a result of the Defendant's multiple and ongoing acts of fraud. Ms. Baker suffered extensive direct and indirect damages, emotional and physical damages, out-of-pocket damages, including consequential damages proximately caused by her reliance on the false information.  Additionally, as the misrepresentations were both willful, wanton and malicious, she is also entitled to punitive damages.

129.     Ms. Baker justifiably relied on their representations to her detriment. Plaintiff invested the value of her intellectual property, unpaid time, travel, materials, pre-production expenses, and other development hard costs.

130.     Thus, both Defendants are guilty of fraud and Ms. Baker is entitled to relief, including punitive damages.

131.     Ms. Baker incurred damages in excess of $7 million dollars because of the false representations made by BenSalz and Excel by and through their agents and employees.

## CLAIM FOUR AGAINST BENSALZ AND EXCEL: BREACH OF FIDUCIARY DUTY

132.     Plaintiff incorporates herein, as if fully set forth, all the preceding paragraphs.

133.      Defendants were licensed New York talent agents working on Ms. Baker's behalf in New York as Ms. Baker's fiduciaries and representation. Therefore the law of New York applies.

134.      Defendants BenSalz and Excel as Ms. Baker's agents owed Ms. Baker a fiduciary duty of care. They also owed her duties of honesty and loyalty.

135.      Defendants allowed their agents to lie, harass, and act counter to Ms. Baker's best interests on numerous occasions, ultimately harming Ms. Baker including her career, health, and peace of mind. Their failure to perform and other breaches of duty and care caused her to lose unique once in a life time offers and opportunities and substantive emotional, financial loss and injury.

136.      Defendant BenSalz acted intentionally and/or recklessly when their agent Mike Skouras repeatedly threatened and harassed Ms. Baker sexually, personally and professionally; when he propositioned her and then when she did not respond as he wished, verbally abused then criminally threatened her and her associate Mr. Gary Rhein.  The Defendants acted willfully, maliciously and with impunity when they followed through with their threats to 'kill' Ms. Baker's project, to defame and besmear her good name to ruin her career and reputation, and when they purposefully induced severe emotional distress by threatening her with physical bodily harm if she ever dared to share anything about what had happened or how they had mistreated her with anyone else.

137.      Defendants Casey Close/Excel Sports Management acted intentionally and or recklessly when they aided and enabled their partner's cruel, abusive and fraudulent behavior and allowed their client, Ms. Baker, to continue to

work under severe emotional abuse, deceit and harassment by Co-Defendant
BenSalz's agents after she repeatedly reported their misconduct and abusive
behavior to them through detailed voicemail, email, texts and multiple phone
calls.  Excel also failed to obtain any NDAs for her, knowing that such a step
would have been in Ms. Baker's best interest and despite the fact they had
agreed to do this, both orally and in written communications. All of these
failures were breaches of their fiduciary duties.

138.    BenSalz and Excel knowingly and wantonly mishandled Plaintiff's IP
by handing over her proposals and script to Jeff Bazoian of Rabo Bank, a third
party Baker did not know and was not introduced to, without NDAs or any
information to establish what his role in the project would be. Defendants
concealed their motives and never revealed the interconnections between
the parties nor Rabo Bank's prior and ongoing sanctions and wrongdoings.

139.    Both Defendants BenSalz and Excel failed to perform their fiduciary
duties by not seeking nor securing any financiers nor talent for the *Finney*
project as promised and by making no known effort to procure any private or
corporate sponsors or investors nor did they make any vested, honest effort
to pursue any bank, hedge funds, commercial lender or other entity for any
production loans or any other valid equity investments for the *Finney* film.

140.    BenSalz failed to perform their fiduciary duties by failing to present
the Animal Planet/Discovery partnership proposal Ms. Baker had prepared
and that ATM had recommended be presented to executives at the network.

141.     BenSalz failed to perform by failing to seek or obtain any financing commitments nor any Letters of Interest or voice talent contracts from Betty White, Justin Bieber, Barry Manilow, Tracy Morgan, Steve Colbert, Gretchen Carlson or any other A list talent as they had overtly promised and agreed.

142.     Excel failed to perform by not reaching out to Derek Jeter, Tiger Woods or any other sports stars on their roster of clients nor did they make effort to contact Creative Artists Agency to secure voice actors as promised.

143.     Excel failed to perform by not following through on their promises to pursue literary agents, corporate partners or book publishers.

144.     BenSalz failed to perform by not presenting Baker's book/manuscript to their literary and publishing contacts despite multiple promises to do so. Instead of effort, they gave an insincere excuse that "kids books don't sell."

145.     BenSalz failed in their duty of care by disingenuously discouraging Ms. Baker from selling her script, book rights and or other IP and by dissuading her from seeking other alternatives for her creative properties thus keeping her strung along for their illicit ulterior motives.

146.     Defendant Excel failed in their duty of care and did not exercise the utmost good faith or undivided loyalty throughout their representation and fiduciary relationship with Ms. Baker. This was exemplified in Excel's failure to follow proper industry protocols in the handling of Ms. Baker's script and IP and for their failure to obtain a single NDA from any prospect or studio approached by themselves and or by their partners and co-agents BenSalz.

147.     Excel breached their duty of care when they completely failed to
protect, investigate and or intervene when Ms. Baker complained multiple
times of the harassment, bullying, belittlement, and deceit and misconduct
being instigated upon her by their partners Defendants BenSalz.

148.     Defendant Excel failed in their duty of care and failed to perform by
not aggressively and competently seeking any and all opportunities for their
client Baker, failed to pursue leads provided by Baker, and made no effort to
pursue any of the referrals for potential funding or co-production provided
by Ms. Baker (Pierce Brosnan, Elton John, Natalie Portman, Ashley Judd etc.)

149.     Excel failed in duty of care when they failed to aggressively work with
partner George Johnsen as promised to pursue investors/additional funding
and to present his offer to produce the film in his Australian studio to obtain
additional cost savings/tax incentives and to relay such to Village Road Show.

150.     Excel failed in their duty of care by not ever following up with Steven
Spielberg, Dreamworks or the supposed "interest from Disney". Excel failed
to follow up with Arc Productions or Mr. Johnsen and S. Korean investors and
allowed their interest to languish and ultimately be lost.

151.     Excel failed to perform by not presenting Ms. Baker's IP to all of their
purported esteemed sports and celebrity contacts nor their film industry
contacts including those of the Creative Artist Agency as they promised.

152.     Due to these multiple failures, the Plaintiff lost opportunities to profit
from her work and incurred significant damages; direct and indirect losses of
her time, money, materials and other valuable non-recoverable resources.

Ms. Baker and her associates also suffered embarrassment, humiliation, damage to their reputations, lost opportunities, and lost income.

153.     Defendants breached their duty of care and loyalty as fiduciaries and used their positions of power and influence to intimidate, humiliate, and to inflict fear upon Plaintiff causing her undue pain, grief and suffering. Thus, the Defendants were not looking out for Ms. Baker's best interests, causing not only financial injury but extreme emotional & physical pain and suffering.

154.     Plaintiff is entitled to equitable relief and all other available allowable legal remedies (and as the breach of fiduciary duty sounds in fraud, monetary and or punitive damages should the court allow and consider such relief.)

## CLAIM FIVE AGAINST BENSALZ:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

136.     Plaintiff incorporates herein, as if fully set forth, all the preceding paragraphs.

137.     Defendant BenSalz through its agent Michael Skouras made physical threats against Ms. Baker and abused her with sexist hostile emails, phone calls and texts.  Repeatedly Mr. Skouras threatened to destroy her career and to blacklist her in the industry to which she had committed her entire life savings and years of sacrifice. Eric Salzman, a BenSalz agent, also subjected Ms. Baker to insulting, sexist comments and disparaged and embarrassed her to her partners and colleagues. He also harassed her via email repeatedly.

138.  Defendants BenSalz made multiple ongoing threats to destroy Plaintiff's professional reputation and career and to sabotage and derail her projects. Mr. Skouras made criminal threats to Baker and her colleague Gary Rhein.

139.  BenSalz inflicted emotional duress upon Plaintiff by sending an email April 24, 2018 to Ms. Baker with a link leading to nefarious spy or malware. This was an intentional act of aggression on behalf of Defendants to instill fear and to intimidate and harass Ms. Baker, inflict damage to her computer and work, disrupt her peace of mind, compromise her safety and privacy, and to nefariously gain access to her proprietary documents and personal data. It is also an act of harassment and stalking in violation of Ohio law and caused Ms. Baker emotional and physical distress, pain and suffering resulting in her incurring additional expense to try to protect herself and her family and her property and home. Based on the history of BenSalz and Mr. Skouras having previously bullied, criminally threatened, harassed and intimidated Plaintiffs, the receipt of this email and other suspicious calls, texts and related activities has been extremely troubling to Ms. Baker who has since been suffering from extreme anxiety, depression, sleeplessness, stomach pain, headaches, nausea and vomiting and exhibiting the symptoms of post-traumatic stress disorder.

140. The timing of this most recent harassing email makes this claim timely and is indicative of the Defendant's potential for aggression and their intent to intimidate and retaliate against Ms. Baker or at the very least inflict fear and more emotional pain and suffering and other duress upon her.

138.    This project was profoundly personal work for Ms. Baker that meant more to her than just a means to make money. Due to this intimate bond and the significant personal investment she made into the project, the heartless,

self-serving conduct of the Defendants and the devastating impact it had on

her life's work caused extreme, long lasting grief and despair for Ms. Baker.

139.    The efforts by the Defendants to inflict fear and duress upon the

Plaintiff was egregious, malicious, and purposeful. The emotional duress

suffered by Ms. Baker during 2012 continues to have lasting repercussions,

with this most recent act of harassment causing post-traumatic stress and

severe pain and suffering.   Plaintiff is seeking in damages of over $7M.

<u>**CLAIM SIX AGAINST BENSALZ AND EXCEL:**</u>
<u>**CIVIL CONSPIRACY**</u>

140. Plaintiff incorporates herein as if fully set forth all preceding

paragraphs. By acting in concert between themselves and with other third

parties such as Rabo Bank, Jeff Bazoian, Bruce Berman, Village Road Show

and other known or unknown third parties, past and or present, which could

be revealed by further discovery; by information and belief, Plaintiff believes

that the Defendants, BenSalz Productions, its officers and partners and Excel

and its partners, engaged in a civil conspiracy to abscond, misappropriate

and profit from Plaintiff Belinda Baker's intellectual property ("IP") and to

use her creative products and trade secrets in a concealed manner to try to

create some type of self-serving financial investment scheme, to maximize

profits that would be in violation of laws, regulations and contracts, and to

use their connections to orchestrate this conspiracy and to misappropriate

Ms. Baker's original creative IP, to unfuly profit from her ideas and or trade

secrets and orchestrate an illicit investment plan or financing deal without

her knowledge and to work in concert to defame and disparage her and her

creative properties to 'all of the major studios and networks', besmear her

good name and project and her reputation in the industry and convert her

contacts for their own use, and to disrupt her efforts to progress her projects.

The Plaintiff believes that this conspiracy began sometime in 2012 and may

have involved other unknown third partners and current or former business

associates of hers and the parties to this lawsuit, which further investigation

and discovery should reveal.  Plaintiff has good cause and reason to believe

this conspiracy has been covert and ongoing thus making this claim timely.

The co-conspirators worked duplicitously to conceal their plans from the

Plaintiff and worked in tandem between themselves and others to cause her

significant financial and emotional damages. Plaintiff seeks injunctive relief

and compensatory and punitive damages in excess of $7 million dollars.

### CLAIM SEVEN AGAINST BENSALZ AND EXCEL:
### TORTIOUS INTERFERENCE WITH BUSINESS CONTRACTS,
### AND PROSPECTIVE ECONOMIC RELATIONS

141. Plaintiff incorporates herein as if fully set forth all preceding paragraphs

and allege by information and belief that Defendants were aware of actual contracts

and existing and prospective business relationships that the Plaintiff had with third

parties; and that Defendants unlawfully and maliciously interfered with Ms. Baker's

business relationships to disrupt them and cause her economic harm, and that they

wantonly sought to interfere with her prospects and relationships with various film

studios, production companies, private investors and corporate entities to interrupt

and interfere with her business endeavors, existing and or prospective contracts

with them and in particular to disparage her and to discourage these companies and

or individuals from doing business with her in the future. Some of these include

Animal Planet/Discovery, an array of A list talent some of whom are represented by

the CAA agency, Sea World and Acrylic Tank Manufacturing.  Specifically, Plaintiffs

had a long standing contract and business relationship with ATM and the "Tanked"

family and that was interfered with and disrupted. ATM had already committed to a

licensing deal and voicing characters in Plaintiff's film and actively supporting her

project with owners Wayde King and Irwin Raymer expressing interest in serving

on her board of directors. They had also offered to assist her in pursuit of private

investors, promoting a crowdfund effort and seeking renewed interest from Animal

Planet/Discovery and celebrities like Shaquille O'neill, Tracy Morgan, Mario Lopez,

Betty White and many others in exchange for a potential equity stake in her project

and company but later withdrew their efforts, offers, and participation after April

2017 after Defendants ongoing disparagement, espionage and ongoing legal threats

interfered with Plaintiffs past and prospective contracts. Defendants also interfered

with Baker's prospective business relationships with her past and former contacts,

and by information and belief even attempting to approach Sea World and or other

contacts of Ms. Baker's with a similar film project and to pitch them on promotions,

events and other misappropriated trade secrets. Despite multiple attempts to work

with Animal Planet/Discovery, Plaintiff was shut out and rejected, despite efforts to

renew Sea World's interest, to work with CAA, and its agents, even after A list talent

they represent had expressed interest in her project, she was shut out which she

feels is due to the prior blacklisting and disparagement and the ongoing and covert

interference of Defendants impeding Baker's prospects and efforts to her detriment.

**RELIEF**

WHEREFORE, Plaintiff asks the Court to render judgment as follows:

a.  Award Plaintiff actual, compensatory damages of at least $7 million dollars;

b.  Award Plaintiff any and all equitable relief still possible including compelling Plaintiff's to perform the duties of their prior contract and properly submit the Plaintiff's current scripts and IP to all of the named film studios, TV/cable networks, producers and talent agencies such as CAA as named herein and to do so in good faith and if this is not possible provide other comparable relief;

c.  Award Plaintiff declaratory judgment requiring Defendants to obtain and or provide all requested copies of authentic signed third party NDAs, emails or other proof of submission of Plaintiff's IP (names, dates, details) and provide and publish a written apology and retraction of any derogatory, disparaging false statements to all named third parties in this suit and the public at large;

d.  Award Plaintiff reasonable attorney's fees and Plaintiff's costs;

e.  Award Plaintiff special damages of at least $750K and punitive damages of at least $7 million;

f.  Award Plaintiff any and all other damages the court deems appropriate.

**CERTIFICATION AND CLOSING**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the

factual contentions have evidentiary support or, if specifically so identified, will

likely have evidentiary support after reasonable opportunity for further research,

investigation and or discovery, and (4) the complaint otherwise complies with the

requirements of Rule 11.

### JURY DEMAND

NOW COMES the Plaintiff, as pro se litigant and hereby demands trial by jury.

RESPECTFULLY SUBMITTED,

Belinda R. Baker
824 Oaktree Court
Lebanon Ohio 45036
Pro Se litigant