UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BELINDA BAKER, | ) | CASE NO. |
| | ) | |
| STARBORNE PRODUCTIONS, LLC, | ) | JUDGE _____ |
| | ) | |
| and | ) | |
| | ) | |
| STARBREACHER ENTERPRISES LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BENSALZ PRODUCTIONS LLC, | ) | **SECOND AMENDED COMPLAINT** |
| | ) | **WITH JURY DEMAND** |
| MICHAEL SKOURAS, | ) | |
| | ) | |
| EXCEL SPORTS MANAGEMENT LLC, | ) | |
| | ) | |
| CASEY CLOSE, | ) | |
| | ) | |
| TWENTY-FIRST CENTURY FOX, INC., | ) | |
| | ) | |
| FOX ENTERTAINMENT GROUP LLC, | ) | |
| | ) | |
| FOX CORPORATION, | ) | |
| | ) | |
| FOX BROADCASTING COMPANY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FOX TELEVISION STATIONS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES Plaintiffs Belinda Baker, Starborne Productions ("Starborne") and Starbreacher Enterprises, LLC ("Starbreacher"), by and through counsel, and for their Complaint against Defendants, state as follows:

**JURISDICTION**

1.    This Court has original jurisdiction over this action under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

2.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

**PARTIES**

3.    Plaintiff Belinda R. Baker ("Baker") is an individual domiciled in Warren County, Ohio.

4.    Plaintiff Starborne Productions, LLC ("Starborne") is a limited liability company organized under the laws of Ohio with its principal place of business in Warren County, Ohio. All members of Starborne are domiciled in Ohio.

5.    Plaintiff Starbreacher Enterprises, LLC ("Starbreacher") is a limited liability company organized under the laws of Ohio with its principal place of business in Warren County, Ohio. All members of Starbreacher are domiciled in Ohio.

6.    Defendant Mike Skouras ("Skouras") is an individual domiciled in New York County, New York.

7.    Defendant BenSalz Productions, ("BenSalz") is a limited liability company organized under the laws of New York with its principal place of business in New York County, New York. Upon information and belief, all members of BenSalz are domiciled in New York and Defendant Skouras is a principal and/or officer of Defendant BenSalz.

8.    Defendant Casey Close ("Close") is an individual domiciled in New York County, New York.

9.     Defendant Excel Sports Management LLC ("Excel") is a limited liability company organized under the laws of Delaware with its principal place of business in New York County, New York.  Upon information and belief, all members of Excel are domiciled in New York and Defendant Close is a principal and/or officer of Defendant Excel.

10.     Defendant Twenty-First Century Fox, Inc. ("21st Century Fox") is a corporation organized under the laws of the State of Delaware with its principal place of business in New York County, New York.

11.     Defendant Fox Entertainment Group, LLC ("FEG") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York County, New York.  At all times relevant to this action, FEG was a wholly owned subsidiary of 21st Century Fox.

12.     Defendant Fox Corporation ("Fox Corp."), also known as "New Fox," is a corporation organized under the laws of the State of Delaware with its principal place of business in New York County, New York.  Fox Corp. was spun off from 21st Century Fox as a result of the acquisition of 21st Century Fox by the Walt Disney Company on March 19, 2019.

13.     Defendant Fox Broadcasting Company, LLC ("FBC") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York County, New York.  At all times relevant to this action, FBC was a wholly owned subsidiary of 21st Century Fox; however, as of the acquisition of 21st Century Fox by the Walt Disney Company on or around March 19, 2019, FBC became a wholly owned subsidiary of Fox Corp.

14.     Defendant Fox Television Stations, LLC ("FTS") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New

York County, New York.  At all times relevant to this action, FTS was a wholly owned subsidiary of FBC.

**STATEMENT OF FACTS**

15.     In 2011, Plaintiff Baker entered into an agreement with Acrylic Tank Manufacturing ("ATM") to create children's aquariums, inserts and figurines based on her intellectual property, *Finney the Star Breacher* ("*Finney*"), to voice characters in the film and advertise *Finney* on ATM's hit reality television show on Animal Planet/Discovery network, *Tanked*.

16.     At that time, ATM's CEO, Wayde King was working closely with Defendants BenSalz Productions and Michael Skouras, who, upon information and belief, served as co-executive producer and was credited as the "creator" of *Tanked*.  Upon information and belief, Defendant Skouras was also serving as the talent agent for the stars of *Tanked.*

17.     Upon information and belief, Mr. King presented *Finney* to Defendant Skouras.

18.     Defendant Skouras expressed an immediate interest in representing Defendant Baker in relation to developing *Finney* into an animated feature film.

19.     Defendant Skouras solicited Plaintiff Baker's existing materials on the *Finney* project, including the script, book, artwork, marketing plans and computer renderings, for his review.

20.     Upon information and belief, Defendant Skouras shared details about the *Finney* project with his two partners at BenSalz Productions, Richard Bennett and Eric Salzman, as well as his superiors and colleagues at "Fox" about their potential involvement.

21.     Defendant Skouras sought out a business partnership with Plaintiff Baker as co-producer and agent for the *Finney* project, offering to use his connections at "Fox" (at the time, upon information and belief, "Fox" referred to 21st Century Fox and all its myriad

subsidiaries, but since the acquisition of 21st Century Fox by the Walt Disney Company effective May 19, 2019, it is unclear exactly what ties Defendant Skouras still maintains with 21st Century Fox or Fox Corp., the "New" Fox that currently owns the television, news and sports branch of "Fox," but it is clear that Defendant Skouras, by his own assertions, was an agent and/or employee of some subset of the "Fox" companies) to assist Plaintiff Baker in getting voice talent attached to the project and to secure financing and, by leveraging his position and connections within the Fox network, to promote the film after production.

22.     Upon information and belief, Defendant Skouras shared details about the Finney project with his friend Defendant Casey Close, an employee of Defendant Excel.

23.     On or around October 31, 2011, Defendant Skouras proposed partnering with Defendants Close and Excel as talent agents and business partners, engaging in various meetings with Defendant Close and Defendant Excel's marketing team, propositioning them to become the lead agency for Plaintiff Baker and the *Finney* project after Defendant Close had expressed interest in representing Plaintiff Baker.

24.     Defendant Skouras repeatedly stated that he and Defendant Close were receiving overwhelmingly positive feedback about the *Finney* project, which is why they wanted to be Plaintiff Baker's agents and partners.

25.     On November 16, 2011, Defendant Close confirmed that Defendant Excel wished to represent Plaintiff Baker as her agent to assist in securing funding for the *Finney* project, including pursuing major film studio production and participation, as well as to secure voice talent.

26.     Defendant BenSalz entered into a co-production agreement with Plaintiff Starbreacher on November 18, 2011 (a true and accurate copy of the agreement is attached

hereto as Exhibit A) pursuant to which Defendant BenSalz agreed to provide services commiserate with industry standards for co-executive producers of a major feature film in exchange for guaranteed fees, a percentage of any funding secured for the project, and an equity share in the net profits of the movie and related merchandising.

27.     Plaintiff Baker and Defendant BenSalz entered into a non-disclosure agreement ("NDA") on December 12, 2011 (a true and accurate copy of the NDA is attached hereto as Exhibit B).

## SEXUAL ASSAULT

28.     In December 2011, *after* the parties agreed on the agency relationship and entered into the contracts, Plaintiff Baker flew from Ohio to New York City to meet the various Defendants and their respective representatives in person.  While there, Plaintiff Baker was sexually harassed and assaulted by Defendant Michael Skouras.

29.     At the time of the sexual assault, Defendant Skouras was working for both Defendant Fox and for Defendant BenSalz.

30.     When Plaintiff Baker arrived in New York, Defendant Skouras first met her at Fox's NYC headquarters where he was working.  Defendant Skouras offered to take Plaintiff Baker on a tour of the Fox building, touting about all the ways that he could help Plaintiff Baker and the *Finney* project through his many Fox connections.

31.     After impressing Plaintiff Baker with his status and power, Defendant Skouras began to insinuate that he could help *Finney* in a *quid pro quo* exchange for sexual favors.

32.     Defendant Skouras subjected Plaintiff Baker to inappropriate banter and sexual advances almost immediately at their initial meeting at Fox headquarters and carried on throughout the day, becoming more aggressive, pushy and suggestive on their way to

Defendant Excel's headquarters.  Defendant Skouras asked about Baker's relationship status with comments that she was very attractive and wondering if she was single or ever "fooled around" and if she was traveling alone, how long she was staying in NYC and if she didn't like her hotel that she was "welcome to stay at his place."

33.     Plaintiff Baker found these questions inappropriate and uncomfortable and tried to put a stop to this behavior by explaining that she was married and a Christian, bluntly stating that she did not engage in this sort of behavior.  Defendant Skouras shrugged this off, suggesting that being from Ohio, she was simply naive because using one's looks and sleeping around was how many women got ahead in the entertainment industry.

34.     Throughout the meeting at Fox headquarters, Defendant Skouras repeatedly petted and pawed at Plaintiff Baker in a demeaning and demoralizing way—rubbing her arms, patting at her legs and squeezing on her shoulders—while making his sexist propositions.

35.     During their conversation on the walk over to Defendant Excel's office and while waiting for Defendant Close, Defendant Skouras continued with the unwelcomed physical advances, going further to state that after he and Defendant Close got the *Finney* film funded, he would ensure Plaintiff Baker got publicity for her project through his many top level inside connections at Fox, including Fox's Vice President of News, Michael Shapiro.

36.     Defendant Skouras went on by telling Plaintiff Baker that if she were "really nice" to him and willing to "work more closely with him" that he would pursue additional support for her projects and career, and obtain the promotional participation from his employer, Fox, including promising to have Plaintiff Baker and her voice cast on shows such as *Fox & Friends*.

37.     Defendant Skouras promised he would be able to introduce the *Finney* script through his "very powerful connections and highest-level executives at Fox" to the "top decision makers at 20th Century Fox and at the Fox-owned animation studio Blue Sky."

38.     Defendant Skouras also promised to have Plaintiff Baker as a future guest on radio shows that were supposedly being produced and promoted by Defendant BenSalz and owned by Defendant Fox for her to plug the *Finney* film.

39.     While making these promises, Defendant Skouras reached out repeatedly to rub Plaintiff Baker's back, arms and leg in a highly suggestive, sexual manner and at one point he purposefully ran the back of his hand across her breast.

40.     Plaintiff Baker felt extremely uncomfortable, afraid, diminished and pressured during the ordeal as a result of Defendant Skouras's unwanted physical contact, lewd gestures, suggestive comments about her appearance, overt pressure to dine or have drinks with him and his dubious requests to have a private "follow up strategy meeting" in her hotel room.

41.     When Defendant Skouras was alone with Plaintiff Baker in an elevator at one point, he forcibly pushed himself against Plaintiff Baker from behind and rubbed his groin up against her.  When Plaintiff Baker moved forward trying to escape, she stumbled and Defendant Skouras reached out to grab her crotch and grope her buttocks.

42.     The experience was not just degrading and humiliating for Plaintiff Baker, but frightening and intimidating because she was trapped alone in an enclosed space with Defendant Skouras.  The more humiliated and shocked Plaintiff Baker became, the more amused Defendant Skouras seemed.

43.     After the meeting, Defendant Skouras continued to hound Plaintiff Baker, asking her to go grab a drink with him or meet later for dinner that night or the next.  Defendant Skouras

tried to escort Plaintiff Baker back to her hotel, asking if he could stop by her room to discuss their burgeoning working relationship.

44.     When Plaintiff Baker turned down all these advances, Defendant Skouras became petulant and informed her that she ought to be "more grateful to him" because of how powerful and influential he was.  When Plaintiff Baker struggled with how to respond and expressed her discomfort over his behavior, he brushed off his harassment as "just normal guy stuff" and that she should feel flattered and appreciate that he and Defendant Close had gotten on board with her project.

45.     After his advances were rebuffed, Defendant Skouras's overall behavior and attitude towards Plaintiff Baker grew more bitter, hostile, demeaning, sexist, and threatening.  This included consistent threats throughout the course of their professional relationship in 2012 to tarnish her reputation in the industry and to kill her project despite his fiduciary duty to her as her agent, partner, and co-producer.

46.     As the threats became more vicious and frequent, Plaintiff Baker expressed her concerns over Defendant Skouras' hostile, abusive, and sexist behavior to her colleagues Gary Rhein and George Johnsen, her sister, best friend, and more explicitly to her husband, Christopher Dorsch.  She eventually reached out to the Defendants themselves, including Defendant Excel and Defendant Close, explaining that she was being bullied and harassed, pleading that they intervene to protect her from further abuse and imploring them to take action on her behalf.

47.     On June 25, 2012 in a detailed email sent to Defendant Close's assistant, Stirling Fiss, the client services manager at Defendant Excel, Plaintiff Baker expressed her dire concerns over the incessant bullying, the misogynistic comments, the ongoing threats of retaliation

and the inordinate duress and the emotional and physical stress and pain it was causing her and that she was concerned for her well-being and personal safety on account of the behavior of Defendant Skouras and asked for Defendant Close's intervention.

48. Sadly, Plaintiff Baker's pleas to the Defendants fell on deaf ears.

49. Finally, Plaintiff Baker called Defendant Close at Excel and left him an urgent voicemail pertaining to her concerns about Defendant Skouras' inappropriate conduct and all of the stress he was causing her, as well as to address all of the inconsistent and contradictory information that she was receiving. This call was never acknowledged nor returned.

50. Plaintiff Baker followed up with calls to Ms. Fiss, reiterating her plea, and extensive emails to Defendant BenSalz's managing partner, Richard Bennett, informing him of the situation.

51. Defendant Skouras continued the same pattern of contemptable behavior throughout 2012 unabated, sexually objectifying, denigrating, and disrespecting Plaintiff Baker in various phone calls, emails, and text messages, including making threats of retaliation. Although Defendant Skouras was careful to keep the worst of it out of recorded media, he displayed an extremely sexist and misogynist attitude toward women in general and Plaintiff Baker specifically in his many bitter, hostile calls and emails sent to her and her colleagues.

52. After November 12, 2012, when the professional relationship deteriorated, Defendant Skouras made it clear he intended to not only blacklist Plaintiff Baker, "crush her career" and "kill" her project but also threatened her with retaliation and physical violence.

53. Defendant Skouras then contacted Plaintiff Baker's associate, Gary Rhein, to threaten Mr. Rhein and Plaintiff Baker, warning them both that he was a "dangerous and powerful

guy" whom they shouldn't have crossed because he has a "notorious reputation." After a spate of vicious threats in calls, texts and emails, Plaintiff Baker felt he was serious about his ability and intention to inflict severe physical, personal and professional harm to her. This fear was so intense and visceral that Plaintiff Baker immediately informed her husband of the threats so that he could contact the authorities in case something happened to her.

54.     Defendant Skouras' reprehensible actions against Plaintiff Baker inflicted acute, significant and long lasting physical and emotional harm as well as severe psychological distress.

## **FOX CULTURE**

55.     "Fox" is a brand with world recognition. The public identifies the multinational mass media company with its original founder, Australian native Rupert Murdoch ("Murdoch"). Over the years, Murdoch evolved his hugely successful News Corporation into an even larger, more powerful mass media company. Murdoch achieved growth, in part, by creating an American cable and satellite television channel, Fox News Channel ("FNC") in 1996. Murdoch appointed Roger Ailes ("Ailes") to lead FNC, and Ailes did so without interruption until his recent downfall.

56.     In July 2017, FNC's anchor Gretchen Carlson exposed the misogynistic culture at Fox by filing a lawsuit alleging that Ailes subjected her to a litany of sexually harassing comments and actions, including ultimately telling Ms. Carlson that her career would have been well served had she agreed to have sex with Ailes.

57.     The lawsuit by Ms. Carlson led to a string of revelations by more than 25 women who were similarly subjected to such coercive and harassing behavior by Ailes over the course of

his tenure at Fox, revealing that Ailes had regularly used his position of power and influence to make unwanted sexual advances toward junior female employees.

58.     The fallout from the allegations resulted in Ailes stepping down as the CEO of FNC. Fox's internal investigation unearthed evidence that sexual harassment of female employees extended far beyond Ailes and his immediate circle.  There were leaked reports of a number of women working for Fox's various subsidiaries that, over the last decade, personally experienced or witnessed other women being subjected to intimidation and sex-based misconduct at the hands of male managers, supervisors and coworkers throughout Fox.

59.     Since Fox ousted Ailes, more women filed claims against Fox in connection with Ailes' sexual harassment.  All of these women, former and current employees of Fox, described shockingly similar stories about men in positions of power at Fox who used their power to satisfy their egos and personal sexually-motivated desires by intimidating, manipulating, emotionally and physically abusing and controlling their female colleagues and subordinates with no care for the long-lasting effects of their predatory, discriminating, perverted behavior.

60.     These cases reveal that for decades, there was systematic sexual harassment that centered around Ailes' desire to objectify and treat women poorly and deny them even their most basic civil and human rights.  This permissiveness to degrade and mistreat women permeated Fox's corporate culture, which fostered and cultivated a company where male employees were enabled if not outright encouraged and emboldened to treat females as second-class citizens, subjecting them to blatant gender bias.

61.     After Ms. Carlson's lawsuit hit the spotlight, leaked media reports began to surface suggesting that Fox engaged in a pattern and practice of threatening and bullying women

into silence for purposes of protecting the company's image and the *status quo* where male executives could continue to indulge in their sexual whims and abuses of power. The sheer number of women who allege to have been treated in a similar manner shows that Fox failed to take appropriate and necessary action to curtail the abuse, despite the obvious conclusion that these sexual harassment and assault incidents were likely systematic and pervasive.

62. The claims of many of these women also served to unearth the collective effort by high ranking Fox executives who knew about the abuse and discrimination but who actively participated in it, knowingly looked the other way, or expressly ratified the injustice by working to cover up the discriminatory conduct and silence the victims, often with the same kinds of threats of humiliation and destruction of careers, finances and reputations or other forms of retaliation that were used against Plaintiff Baker.

63. Disturbingly, the behavior exhibited by Defendant Skouras is substantially similar to the many claims against Ailes and Bill O'Reilly, another famous, powerful and influential Fox employee who was guilty of the same pattern of behavior against females with whom he cultivated a mentoring relationship, then offered advice and suggested he could help advance their careers. Indeed, Defendant Skouras may very well have been emulating the abusive behavior he witnessed at work by some of Fox's more illustrious personalities.

64. This history of systematic abuse of women by men in positions of power at Fox helps explain how Defendant Skouras came to believe that he, too, could treat women as objects to use and abuse as he saw fit, with no threat of repercussion from his employer or his peers.

**CONTRACTUAL RELATIONSHIPS**

65. On December 20, 2011, Plaintiff Baker met with the Defendants and their agents at Excel's offices in New York City. At this meeting, Defendant Skouras and Defendant Close

discussed her project in detail, solidifying their commitment to work with Plaintiff Baker to represent her in the development, financing, and production of the *Finney* project.

66.     Defendant Close spoke highly of Plaintiff Baker's creative work, script, and team and seemed appreciative of her laborious journey to bring her project to life on screen. Defendant Close talked proudly of his Ohio roots, how he was from Columbus, Ohio and still has extensive connections to Ohio, including his work with Cincinnati Reds Hall of Famer Barry Larkin.

67.     Defendant Close introduced Plaintiff Baker to Stirling Fiss, Excel's client services managers, and Jayme Messler, Excel's head of marketing, who would work closely with Baker.

68.     At the same meeting, Defendants convinced Plaintiff Baker to trust them, wowing her with all the connections with huge film studios, famous celebrities and athletes, and promises of connections with wealthy financiers necessary to get *Finney* made as a first class, big budget animated movie.  The Defendants raved about the commercial viability of the *Finney* story and global appeal of the characters, how well-developed and supported the project already was and the fact that Plaintiff Baker already had a standing offer and a memorandum of understanding for $20 million of the proposed $40 million budget.

69.     On December 21, 2011, Richard Bennett, managing partner of Defendant BenSalz, signed the NDA on behalf of Defendant BenSalz.  Subsequently, Defendant Skouras also signed the NDA and faxed a copy to Plaintiff Baker from his office at Fox.

70.     The NDA is subject to the laws of the State of Ohio and required Defendant BenSalz to properly document any dissemination of *Finney* related materials and obtaining permission before such dissemination.

71.     The promise to abide by the terms of the NDA was affirmed by Defendant Skouras as early as October 31, 2011 via email.

72.     The NDA requires Defendant BenSalz and its agents and employees, including Defendant Skouras, or any associate or partner of Defendant BenSalz, including Defendant Excel and Defendant Close, to keep all materials and information related to *Finney* confidential.

73.     The NDA further requires Defendants to properly document and disclose to Plaintiff Baker details of who, when, where and how disseminations took place and that any and all third-party recipients must sign and duly execute a written non-disclosure agreement to be provided and obtained by the Defendants *before* sharing any of Plaintiff Baker's intellectual property.

74.     The NDA was retroactive, so Defendants were required to seek out non-disclosure agreements from all prospects they had already communicated with regarding the *Finney* project.

75.     Defendant Skouras highlighted the importance of a good NDA via email to Plaintiff Baker stating that one should always be very careful not to share their original story ideas, or any proprietary proposals, or scripts without one as the entertainment industry is a "nasty industry where ideas are 'easily stolen' and you can't trust anybody."

76.     Defendant Skouras promised to be diligent in enforcing the NDA and that he would personally handle obtaining signed NDAs from anyone that he and or his partners talked to about the *Finney* project. He even offered to have his attorney Nicole Page prepare the NDA.

77.     Yet, by his own admissions, Defendant Skouras took it upon himself to shop the project around to an array of his contacts, including his "friend" Harvey Weinstein, without

Plaintiff Baker's advance knowledge or permission. To Plaintiff Baker's knowledge, Defendant Skouras never provided nor obtained a signed NDA from Mr. Weinstein or anyone else.

78.     The alleged meeting with Mr. Weinstein was relayed to Plaintiff Baker via a brief email and call *after* it took place. When Plaintiff Baker asked Defendant Skouras for more details and to get an NDA, Defendant Skouras said that he would, but never did.

79.     Defendant Skouras and Defendant Excel repeatedly represented to Plaintiff Baker that various key players in Hollywood had copies of the *Finney* script, including Disney, Sony, Blue Sky Studios and DreamWorks, all of which supposedly expressed interest in the project.

80.     Defendant Skouras also claimed that notable director Steven Spielberg had been informed about the *Finney* project via one of his "inside contacts" at DreamWorks and that through this unnamed contact the *Finney* script was directly submitted to Mr. Spielberg who supposedly was intrigued by the story and concept. Plaintiff Baker was thrilled, of course, though she was again informed of it after the fact and never received any evidence that an NDA was signed by Mr. Spielberg or anyone at DreamWorks.

81.     Defendant Skouras repeatedly promised that Mr. Spielberg had already expressed interest in the *Finney* script and it was just "sitting on [his] desk waiting for [Defendant Close] to call" to make it official. Yet, after almost a year of empty promises, Defendant Close never made that critical call.

82.     Defendant Skouras also informed Plaintiff Baker that Defendant Close had been preliminarily discussing the *Finney* project with his contacts at the Creative Artists Agency ("CAA"), where Defendant Close used to work, as well as with various studios "to get a feel for their interest level and the project's potential."

83. When Plaintiff Baker rightfully expressed concerns about this unprotected activity and asked for NDAs, she was brushed off and told that Defendants were "following protocol and not to worry" since "no one steals from that guy" (referencing Defendant Close).

84. Defendants promised to provide Plaintiff Baker with a list of all third-parties they had contacted along with signed third-party NDAs, but this never happened.

85. Defendant Skouras also informed Plaintiff Baker via email on several occasions that Defendant Skouras had shared the *Finney* project with Lis Wiehl, an author and former FNC legal analyst, to get her feedback and possible collaboration. It is worth noting that Defendant Skouras identified Ms. Wiehl as his "girlfriend" in many calls and several emails despite her being married at that time. This unwanted and unprotected exposure of the *Finney* project concerned Plaintiff Baker as she didn't want nor need another writer's involvement.

86. Notably, all of the film studios now owned or affiliated with Fox—Disney, 20th Century Fox and Blue Sky Studios—were all mentioned by either Defendant Skouras or Defendant Excel as having been provided the *Finney* script with "strong interest" yet not a single non-disclosure agreement was ever obtained by the Defendants.

87. To date, Defendants have never produced a single signed non-disclosure agreement or any other written proof of submission to anyone. In fact, over the entire "representation," neither Defendant Skouras nor Defendant Excel managed to attach a single new voice or musical talent, financier or corporate sponsor, despite countless promises that Defendants would pursue their own clients and leads.

**FIDUCIARY RELATIONSHIPS**

88.    Upon information and belief, Defendants BenSalz, Skouras, Excel and Close were, at all times relevant to this litigation, agents and business partners of Plaintiffs.

89.    Plaintiff Baker provided an extensive array of creative and marketing materials, including a 100-page production bible and investment prospectus, scripts and DVDs with samples, to Defendant Skouras.  Defendant Skouras shared these materials with Defendant Close, and both of them expressed how impressed they were with Plaintiff Baker's work.

90.    Through the co-production agreement with Plaintiff Starbreacher, Defendant BenSalz became a fiduciary agent for Plaintiffs.  Furthermore, Defendant Excel agreed to be the lead talent agent for Plaintiffs for the *Finney* project.

91.    Defendant Close had indicated in the December 20, 2011 NYC meeting that he believed the *Finney* project could become the next "Lion King of the Seas," a sentiment echoed by Defendants BenSalz and Defendant Skouras.

92.    Being duly impressed by her well-packaged project and its potential to earn incredible profits, Defendants affirmed their commitment and lulled Plaintiff Baker into a false sense of trust and confidence in their ability to secure the necessary financing and engage a major Hollywood studio to produce the *Finney* film with a series of well-crafted lies and grand but false promises.

93.    Defendants worked with Plaintiff Baker to prepare a streamlined pitch package for use to shop the *Finney* project to their celebrity, finance and industry contacts, including all the major studios for the purpose of financing the film by late 2012.  This was also reiterated in emails sent to Plaintiff Baker by Defendant Skouras indicating Defendant Close had already made headway with many of his contacts, including Mr. Spielberg and DreamWorks and his contacts at CAA.

94.     Defendants promised they would be able to expedite securing funding, dropping names of A-list celebrities that they claimed to know that would help generate interest, like Barry Manilow and Justin Bieber, and Defendant Excel's roster of sports stars, including Tiger Woods and Derek Jeter.

95.     Plaintiff Baker informed Defendants that her colleague, George Johnsen, had already secured $20 million commitment for funding from Clemenson Capital and a group of South Korean investors, which Defendants believed would enable them to attach one of the big three studios for animation and securing additional financing, global theatrical distribution, lucrative licensing/merchandising deals and book deals as well as developing a series of spin-off cartoons, games and apps by leveraging on the growing popularity and success of Defendant BenSalz's rising star client at that time, ATM.

96.     Defendants were also interested in Plaintiff Baker's long-standing connections with Sea World and Jack Hanna, a beloved conservation icon and frequent guest on many popular nighttime talk shows.

97.     However, when Plaintiff Baker asked Defendants how Defendant Close and Defendant Excel would be compensated, she was told by Mr. Skouras not to bother Defendant Close with such details because "he would tell us when he was ready" but that he expected "the industry standard" plus "something on the back end too [because] that is where all of the real big money is."

98.     Defendants promised many times to send a written agreement to Plaintiff Baker commemorating the specifics of the arrangement.

99.     Defendant Close, being a licensed agent in New York, presumably understands the laws governing talent agents.  However, the issue became even more confusing because of

Defendant Skouras and Defendant Close's offer to be a partner in the venture, as there are different "industry standards" for compensation for the different roles.

100.    Confused and quite concerned by the shady responses, Plaintiff Baker pressed Defendants for clarification on Defendant Excel's fees and status of her contract, to which Defendant Skouras responded on June 6, 2012 stating that he would "remind Casey about a *management* contract" but that he would be applying an *agent's* percentage as to the fees, suggesting a desire for double dipping by saying that both he and Defendant Close would "want a piece of everything; all of the licensing, books, stuffed animals, happy meals etc."

101.    Defendant Skouras stated that the reason why Plaintiff Baker had not yet received clarity from Defendant Close was that he "wants to wait and see as bids come in before he puts the contract in play!"  Rather, Plaintiff Baker was scolded with disdain and told that she should be grateful and more patient and be happy that Defendant Close "wasn't shoving contracts at her."

102.    None of this confusion resulting from their cagey approach changed the fact that they represented Plaintiff Baker as her fiduciaries.  Defendants' choice to leave things loose and ambiguous on purpose cannot prevent their liability for violating their fiduciary duty.

103.    Defendant Skouras mentioned numerous times that his partner, Rich Bennett, had garnered interest in the *Finney* project at Rabo Bank, the "funding arm" of Village Road Show, a highly successful Australian studio.

104.    To add to the confusion, Defendants enlisted a third-party, Jeff Bazoian of Rabo Bank, to act as a de facto "agent" without Plaintiff Baker's prior knowledge or approval and without obtaining an NDA.

105.     Mr. Bazoian was allegedly tasked with trying to "shop" and discuss Plaintiff Baker's project with Bruce Berman, CEO of Village Road Show.

106.     Upon information and belief, Mr. Bazoian is not and has never been a licensed talent agent, yet Defendants involved Mr. Bazoian in such an unlawful capacity despite knowing that it violated talent agency laws as well as the NDA.

107.     Upon information and belief, Rabo Bank has since been convicted of money laundering.  In fact, in February 2018, Rabo Bank was sanctioned by the Department of Justice for international money laundering and at its retail operations in NYC are still under further investigation.

108.     Until recently, Plaintiff Baker was unaware of Rabo Bank's troubled past.  While doing research for this lawsuit, she became aware of Rabo's sordid history, including the recent fines and sanctions arising from criminal investigations by the Department of Justice for money laundering and obstruction of justice.

109.     Beginning in January 2012, Defendants proceeded to actively engage in their roles as talent agents for Plaintiff Baker, allegedly shopping the *Finney* project to prospective financiers, buyers and talent.

110.     Defendant Skouras and Defendant Close participated in numerous conference calls with Plaintiff Baker's business associates where Defendants presented themselves as Plaintiff Baker's agents.  One of these calls was with Arc Productions (formerly Starz Animation), a now-defunct but formerly prosperous Toronto-based animation studio that had expressed interest in investing in and co-producing the *Finney* film.

111.   Defendant Excel and its agents assisted Plaintiff Baker in the creation of a revised pitch package, and purportedly disseminated her scripts and comprehensive proposals to various major Hollywood studios.

112.   The creation of the revised "shorter" pitch package largely comprised of Plaintiff Baker working with a graphics designer who was referred by Defendant Excel.

113.   Plaintiff Baker compensated the graphics designer directly.  In addition, Plaintiff Baker provided all the source materials, expended her time on research and development and writing and editing for the new packet.

114.   Defendants also instructed Plaintiff Baker to revise her film budgets, production bible, develop a PPM-investment prospectus, create new promotional demo reels, update and reprint all of the materials and create new materials all at her expense.  In total, Plaintiff Baker expended over $750,000 to accomplish all of these endeavors at Defendants' behest.

115.   On May 9, 2012, Defendant Skouras informed Plaintiff Baker that both Defendant BenSalz and Defendant Excel had approved the new pitch packet, which lists Defendants as partners in the project, and that they would be sending the pitch packet with scripts out the following Monday to Disney, DreamWorks, Sony, MGM, Paramount, Blue Sky, and various other studios and prospects.

116.   Though Plaintiff Baker asked repeatedly, she wasn't included in any calls with these prospects nor copied on any of the communications through which her proprietary materials were, supposedly, sent and she received no proof after the fact that any communications actually occurred or that any parties were required to sign an NDA.

117.    In the interim, through efforts and contacts Plaintiff Baker had already cultivated on her own, she was notified that there was strong interest from a Canadian animation studio, Arc Productions ("Arc"), in producing and partnering on the *Finney* project.

118.    Plaintiff Baker informed Defendants of the interest from Arc and put them in touch with her contact there, CEO Jeff Young.  A conference call was set up between all of the parties.

119.    Defendant Excel provided a copy of the script to Arc, who then made a bid on the production and partial funding of the *Finney* film.

120.    Additionally, Plaintiff Baker and her associate George Johnsen brought to the Defendants a South Korean contact who was interested in funding 50% of the production of the *Finney* film.

121.    Despite the clear interest, Defendants made no apparent effort to follow through on these leads.  Instead, Defendants allowed these viable leads to languish, as they did with any other connection Plaintiff Baker provided for attaching talent or providing production or funding.

122.    When Plaintiff Baker inquired as to the Arc proposal, Defendant Skouras told her to stop asking so many questions, making empty promises that they were working hard with a "way to raise the rest of the funds to produce the *Finney* movie."

123.    Concurrently, Plaintiff Baker invested a great deal of time, money and resources developing an extensive presentation and marketing partnership proposal for Animal Planet/Discovery; the network that airs ATM's *Tanked* TV show.

124.    Despite multiple promises to Plaintiff Baker and the recommendation of Wayde King/ATM to present said proposal to executives at the network, Defendants failed to ever

do so. Instead, promotional ideas, creative content and trade secrets were later misappropriated for Defendant Skouras' personal interest.

125. Plaintiff Baker was informed in a June 11, 2012 email by Defendant Excel that DreamWorks had received Plaintiff Baker's materials and expressed interest. Further, Plaintiff Baker was informed that Bruce Berman had been in receipt of her proposal and script (through Jeff Bazoian of Rabo Bank) and was "interested in the project" and that Defendant Close was going to be "reaching out very soon and calling Bruce Berman of Village Road Show as well as Steven Spielberg and DreamWorks to discuss next steps, etc."

126. This was confusing to the Plaintiff Baker as Defendant Skouras had promised since late 2011 that all of these people had already received the *Finney* materials.

127. The entire charade and incongruent mélange of misinformation pertaining to Berman/Rabo Bank/Village Road Show, as well as Disney, Blue Sky Studios and Spielberg/DreamWorks was ongoing, always followed by excuses and empty promises of imminent action to progress with some sort of deal.

128. In June of 2012, Plaintiff Baker, having been told by Defendant Skouras that her project was being shopped all over the place, sent an urgent email with a list of concerns and requesting documentation that NDAs be signed before her project was being shared with all these prospects.

129. Defendant Skouras acted offended by Plaintiff Baker's request, stating that "Mr. Spielberg and the three big animation studios" had her work and if she didn't like how Defendant Skouras was doing his job then maybe she "wasn't cut out for the business." Yet Baker has never seen anything to prove that her project was ever presented to any of these studios or contacts as the Defendants claimed.

130.    After not hearing anything for a while, Plaintiff Baker checked back in with Defendants.   In several emails, Defendant Skouras berated Plaintiff Baker as "clueless and unfit for the business" and that her desire for updates or proof of progress was "nonsense."

131.    The pattern of aggressive and demeaning behavior by Defendant Skouras progressed to threats, culminating in a promise that Defendant Skouras would "retaliate so hard that [Plaintiff Baker] would not know what hit her."

132.    The business relationship deteriorated further when Plaintiff Baker suggested that she could use connections she and her business associate, George Johnsen, had at the same studios the Defendants professed they'd reached out to, including Village Road Show and DreamWorks, to help facilitate the communication.   Defendants ratcheted up their bullying and control tactics and became even more evasive and abusive especially when Plaintiff Baker indicated her concerns about the slow progress and lack of any tangible results and offers on the table were being lost to inactivity.

133.    When Plaintiff Baker indicated that she might need to consider selling the *Finney* project or seeking other help, Defendants strongly pressured her not to take such proactive efforts and to just be more patient.

134.    The threats made by Defendants eventually turned into outright hostility; including Salzman and Skouras repeatedly saying 'we have a contract and we will sue you!'

135.    The hostile calls and emails continued with Defendant Skouras telling Plaintiff Baker and her colleagues that they couldn't "make a move without him" and that she'd be seriously hurt along with those who might try to help her.

136.    After receiving this email, Plaintiff Baker reached out to Eric Salzman of Defendant BenSalz to express her fears and concerns about Defendant Skouras' hostile calls, texts and

emails. Mr. Salzman replied to Plaintiff Baker with a dismissive email assuring her that "no one was going to hurt her" and that "sometimes people say things in anger."

137. Mr. Salzman also urged Plaintiff Baker not to "do anything rash and sell her [*Finney* property]" assuring her that they were working diligently and that neither "BenSalz nor Casey would waste their time if they didn't see a great financial opportunity in *Finney.*"

138. In a July 9, 2012 email to Gary Rhein, Defendant Skouras stated he was "pissed off" at Plaintiff Baker for asking for NDAs and some proof that effort was being made and for expressing her frustration that her leads were being left to languish. Defendant Skouras told Mr. Rhein that Plaintiff Baker had "better hope he did not crush her project right then" and repeated his rant that she "could not make a move without him."

139. Defendant Skouras then went on to threaten yet again to "kill the project" and "if she didn't watch out it wouldn't be the only thing."

140. From August to November 2012, there were no developments on Plaintiff Baker's project being made by Defendants whatsoever.

141. Despite being told in many calls, texts and in emails that "great progress had been made" and things were "going as planned" there was no evidence Defendants had ever followed through on pursuit of any studios or talent or pursued any individual or institutional investors as promised.

142. Plaintiff Baker, through her own efforts and at her own cost, developed promising business contacts that expressed interest in *Finney* and requested the script from Defendant Excel, yet for no explainable or excusable reason, Defendant Excel failed to follow through with any of them, despite having a fiduciary duty to represent Plaintiff Baker.

143.    Plaintiff Baker continued to not get any clear answers from Defendants and the project seemed to be stalled so she suggested that Defendant Close work with her business partner George Johnsen in Burbank to see if they could come up with a plan to expedite the work on pushing the *Finney* project ahead.   She was then informed by Mr. Salzman that Defendant Close had in fact spoken to Mr. Johnsen already and that they had come up with an action plan, namely for Excel to lead the charge in expediting the securing of the remaining financing through their studio and sports/celebrity contacts and Defendant BenSalz's banking connections.   When Plaintiff Baker followed up with Mr. Johnsen, however, he indicated that he had not heard from any of the Defendants and that there was no meeting or any action plan.

144.    On August 27, 2012, Defendant Skouras contacted Plaintiff Baker to inform her that he supposedly heard back from Disney and that they were interested.  Apparently, Spielberg was *still* waiting on a call from Defendant Close before making the script consideration official but Defendant Skouras assured Plaintiff Baker that they still were interested.

145.    On August 31, 2012 Plaintiff Baker was informed that Bruce Berman of Village Roadshow had supposedly personally requested a copy of the *Finney* script.   Then Defendants returned to ignoring Plaintiff Baker's requests for information and updates.

146.    Still not getting any clear answers about how the work or progress was going on her project, Plaintiff Baker reached out yet again, at which point Mr. Salzman assured her that everything was going as planned and that Mr. Berman had the script and a $1 billion credit line had been set up for Village Road Show by Rabo Bank.

147.    On September 12, 2012, Plaintiff Baker was informed by the Defendants that Mr. Berman had since "read the script and liked it" and was "ready to discuss next steps."

148.    Unfortunately, by October 2012, absolutely nothing was actually done and things began falling apart between Plaintiff Baker and Defendants as evidenced by an email from Mr. Eric Salzman dated October 2, 2012 wherein he told Plaintiff Baker that she was "too batshit crazy for anyone to deal with."

149.    Mr. Salzman also echoed Defendant Skouras' prior threats that Plaintiff Baker "couldn't make a move without them" or else suffer their wrath if she dared pursue her or her colleagues' leads at the same or different studios by themselves.

150.    Following this nasty email from Mr. Salzman, Defendant Skouras also emailed and called Plaintiff Baker to spiel off more condescending, sexist, degrading comments, threats and insults and then called and texted her associate Gary Rhein as well to continue his angry tirade.

151.    Considering the tenor of these communications and her growing suspicions, Plaintiff Baker reached out to Suzy Figoroa, Mr. Berman's executive assistant.  Ms. Figoroa informed Plaintiff Baker that Mr. Berman had never received nor read Plaintiff Baker's script and that there was no record of *anyone* at Village Roadshow ever receiving her script.

152.    At that time, Village Roadshow contacted Plaintiff Baker and said it was a great project but they didn't think it was right for Village Roadshow, contrary to Defendants' many promises otherwise.

153.    Plaintiff Baker was confused by this response especially after her agents had so persistently talked about Mr. Berman's interest in her project and how much he liked the script, when in reality he had never read it.  In fact, Village Road Show claims to have never evaluated her script nor heard of the *Finney* project until Plaintiff Baker reached out by herself.

154.     Having been exposed as liars, Defendant Skouras began sending a series of texts and emails to Plaintiff Baker stating that everyone wanted to walk away from her project and that, in retaliation, they would ruin her name and reputation in the industry by sabotaging and blacklisting her with all of the major studios and talent agencies so her project would "go back to collecting dust."

155.     At the end of October 2012, Plaintiff Baker sent an email to Rich Bennett, the managing partner of Defendant BenSalz, appealing to him to help intercede on her behalf to stop the harassment, threats, deceit and hostility from Defendant Skouras so that the parties could salvage the relationship.

156.     Finally, in November 2012, Defendant Skouras made several hostile phone calls and sent incendiary emails to Plaintiff Baker and to her associate Gary Rhein with a long screed to inform them that her project was "dead" because he was "killing" it, and he would be let every studio know that she was "unfit for the film industry," "a clueless crazy bitch" and a and "complete waste of time."

157.     Ultimately, after a particularly nasty exchange of calls, texts and emails between Gary Rhein and Defendant Skouras wherein Mr. Rhein stood up for Plaintiff Baker and called Defendant Skouras out for his abusive behavior, lack of action and ongoing lies, the bitter exchange was relayed to Ms. Fiss and Defendant Excel.

158.     On November 5, 2012, Plaintiff Baker learned of the animosity when Ms. Fiss emailed to say that she did not feel, based on the exchange that had occurred over the weekend, that the "partnership" would likely continue.

159.    Mr. Rhein was never an officer or employee of Plaintiff Baker or her companies.  In fact, Plaintiff Baker was not even aware of what transpired between Mr. Rhein and Defendant Skouras until Ms. Fiss reached out to tell Plaintiff Baker on November 5, 2012.

160.    At that time, having invested so much into the partnership, Plaintiff Baker still hoped to salvage the relationship with Defendants and expressed such to Ms. Fiss.

161.    The business relationship between Plaintiffs and Defendants did not terminate until November 12, 2012, at which point Plaintiff Baker requested the return of all *Finney* materials.

162.    While Defendants did return a few copies of the *Finney* pitch packages, most of the materials, including books, hard copies of the script, business/marketing plans, art and animation DVDs, investment proposals and production bibles, were actually never returned.

163.    Defendant Excel also failed to provide the "smooth transition" they had promised Plaintiff Baker, including updates, introductions, details on who they'd actually talked to or presented the project to, a status report and the requisite contact information for the leads that were supposedly "still in play" in a way that would avoid disrupting, confusing or alienating prospects.

164.    Initially, Plaintiff Baker was impressed with the grand, convincing promises and perceived prestige of the Defendants.  This was due in part to the false empty promises told by Defendants to string Plaintiff Baker along.  Yet, after almost two years of waiting on Defendant Excel to produce even a single celebrity attachment or Defendant BenSalz to present the project to even one prospective hedge fund or private investor or obtain even a single letter of interest from their array of celebrity connections, it all turned out to be a nightmare of epic proportions for Plaintiff Baker.

165.     Indeed, Defendants purposefully sabotaged Plaintiff Baker's efforts to secure financing, causing her the loss of legitimate offers and once-in-a-lifetime opportunities for success.

166.     Upon information and belief, Plaintiff Baker was just being used as a pawn in the Defendants' plot with Rabo Bank to use the *Finney* project for their own purposes.

167.     There was, however, an intentional effort to intimidate, scare, disparage and control Plaintiff Baker and string her along while subjecting her to a barrage of threats to sabotage and kill the *Finney* project, defame and demean her, and ruin her career.

168.     On April 24, 2018, after Defendants were sent demand letters by the Plaintiff's then attorney earlier that month, Plaintiff Baker received emails from Defendant BenSalz Productions and Mr. Salzman with a nefarious link to spyware/malware designed to infiltrate and sabotage Plaintiff Baker's electronic information.  Plaintiff Baker believes that this was an intentional aggressive act on behalf of the Defendants to harm and intimidate her yet again, as well as an attempt to gain illegal access to her data.  Based on the history of the Defendants' history of bullying, threats, and harassment, receipt of this ominous email, in conjunction with the verbal threats made against her, has incited great fear in Plaintiff Baker.

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

169.     Unfortunately, the Defendants use and abuse of Plaintiff Baker and the interference in her work and property did not end in 2012.  Indeed, Mr. Skouras had been keeping up with Plaintiff Baker's activities and developments with her project as the years proceeded forth as he was kept abreast of what she was doing through his connections with ATM.

170.     At various points between 2012 and 2016, Defendant Skouras connected with a number of Plaintiff Baker's former associates, business prospects and her former production

partners even as Plaintiff Baker continued to pursue new avenues and seek out new partners, sponsors and investors.

171. After the Defendants' representation of Plaintiff Baker concluded by mid-November 2012, with hostile threats of blacklisting and the failure on part of the Defendants to return all of Plaintiffs' proprietary information and property, Defendant Skouras continued working as both an employee, operative and producer for Fox and as a partner of Defendant BenSalz representing ATM as its agent.

172. Despite all of the hardship, set-backs and disruptions and her ongoing suspicions that she was being undermined and sabotaged, Plaintiff Baker was so personally, emotionally, financially and spiritually vested in the *Finney* project she continued to develop and pursue other leads.

173. Thinking that a short film might be more attainable under the constraints of having lost so much time and resources to her prior struggles, Plaintiff Baker started working towards that goal, setting up a new team, creating a script and working with Oscar-winning animation producer/writer/director Dan St. Pierre while staying in touch with ATM's Wayde King and Irwin Raymer.

174. Plaintiff Baker made plans to have ATM create a video pitch and provide fish tanks as perks for an Indiegogo crowdfunding campaign and to present a new pitch package to a number of new interested private investors, celebrity talent and prospects that Plaintiff Baker and her team were procuring.

175. Ongoing discussions transpired along with a number of meetings in Las Vegas with ATM and various other prospective partners, co-producers and investors, some of which Mr.

Johnsen also attended, and a number of draft contracts and updated proposals were sent to ATM.

176.    Plaintiff Baker sent many texts and emails to both Mr. King and Mr. Raymer between 2013 and 2016 wherein she expressed her ongoing fears and concerns about Defendant Skouras.  As Tanked was one of Animal Planet's most popular shows at that time, Plaintiff Baker expressed her interest in obtaining ATM's help to present the network with a co-production and marketing partnership proposal.  Mr. King subsequently provided Plaintiff Baker with a referral and email introduction to Melinda Toporoff of Animal Planet to present the proposal.  Plaintiff Baker also reached out to Animal Planet/Discovery through her own contacts to Rich Ross, then CEO of Animal Planet.

177.    Despite Plaintiff Baker's efforts, the interest she'd originally received from Animal Planet/Discovery to become involved was thwarted and mysteriously tanked.  Comments made recently and while researching for this case has unveiled evidence that this derailment was a direct result of disparagement and disruption by Defendants.

178.    Plaintiff Baker became aware and was informed of Defendants' covert efforts from information inadvertently shared with her by Irwin Raymer.  During a phone call with Plaintiff Baker, Mr. Raymer thought he had put the call on park.  Plaintiff Baker then overheard Mr. Raymer speaking to Defendant Skouras, who chastised Mr. Raymer for still entertaining Plaintiff Baker's calls because he was "wasting his time on a useless twit." Defendant Skouras then informed Mr. Raymer that any attempts by Plaintiff Baker to circumvent him or present her project to anyone at Animal Planet would be futile, especially to his friend, Ms. Toporroff, as such efforts would be ignored and tossed in the trash can.

179.    With her new team, Plaintiff Baker reached out to other contacts and, by mid-2015, Bindi Irwin, an Australian television personality and conservationist, had been officially attached to the *Finney* project and was lined up to record a new sizzle reel.  However, as Plaintiff Baker later discovered, she was being impeded and routinely sabotaged by Defendants.

180.    In 2015, the *Finney* project was introduced to Bindi Irwin through Plaintiff Baker's long-time friend and associate, Damon Patai, who had been an employee of Sea World for over 30 years.  Mr. Patai also introduced the *Finney* project to Robert Irwin, Bindi's brother, and Terri Irwin, Bindi's mother, during an event at Sea World where Mr. Patai serves as an event/marketing director.

181.    At the time, the Irwin children were working as spokespersons for Sea World and Discovery Kids.  After Mr. Patai discussed the *Finney* storyline and conservation themes with the Irwins, Bindi Irwin expressed her enthusiasm and desire to be involved with the *Finney* project and to voice the lead female dolphin character *Finnessa*.

182.    Terri Irwin provided Mr. Patai with the contact information of the Irwin children's manager, Adam Schoff of Zoo Sky Media and shortly thereafter, letters of intent were entered into by the parties.

183.    With the Irwin family's worldwide popularity, their participation with the *Finney* project represented a huge leap forward.  Plaintiff Baker immediately shared the good news with her team, as well as with George Johnsen of Mammoth Vision and ATM, who had stayed in close contact with Plaintiff Baker and expressed a desire to continue working with her despite the fallout with Defendants.

184.    Concerned about the potential interference and previous retaliatory threats of Defendants, Plaintiff Baker sent numerous urgent letters and emails to Mr. King and Mr. Raymer wherein she asked ATM to assist with Animal Planet/Discovery and pleading with them to intervene on her behalf to mitigate any potential retaliatory or defamatory actions taken by Defendants.   Yet, in a cascade of bizarre events, Plaintiff Baker's progress was completely sabotaged and derailed by Defendants yet again.

185.    In late fall 2015, Plaintiff Baker and her husband flew to Los Angeles to meet with Adam Schoff in person, Bindi Irwin's manager, to discuss how he might help expedite studio and investor interest. Mr. Schoff wanted to reach out to Universal, Discovery, Netflix, and private investment firms with which he had contacts.   He also asked if Plaintiff Baker had ever approached Village Road Show, an Australian company that was linked to Rabo Bank.

186.    The meeting was also supposed to include George Johnsen, Plaintiff Baker's former colleague, and his lead animator, Maggie Bellomy, at Mr. Johnsen's Burbank studios. However, Mr. Johnsen requested that the meeting take place off premises because he was working on a "highly secretive project."

187.    Rather than expressing enthusiasm about the Irwins' involvement in the *Finney* project, Mr. Johnsen seemed concerned and annoyed.   Mr. Johnsen then asked to be indemnified if he had to do production on a similarly themed project.

188.    At that time, Mr. Johnsen was apparently already working as a contractor and engaged in negotiations with Sea World for various new projects while Sea World was simultaneously expanding into animation projects and developing new television series, films and in-park rides and theme shows.   They were also negotiating with Village Road Show to develop new real estate and an array of new entertainment projects.

189.    According to ATM, Defendant Skouras was arranging appearances at Sea World for the cast members of *Tanked* and, supposedly, was also scheduling shows at Sea World for *Fox & Friends* while ATM was working on aquarium projects for Sea World's in-park exhibits.

190.    Plaintiff Baker made arrangements with Bindi and Robert Irwin to produce a pitch video at Australia Zoo for use in promoting the *Finney* project, but the production was suddenly canceled without explanation.

191.    Upon information and belief, around that time, a meeting took place at Sea World that was attended by Mr. Johnsen and Sea World's new creative team wherein a knock-off of the *Finney* project was pitched and presented for development by or with Defendants.

192.    The meeting was also attended by Colette Piceau, a creative consultant/contractor for Sea World who had worked with Plaintiff Baker in the past.  Upon information and belief, Ms. Piceau had interrupted the presentation to mention that the pitch sounded very much like Plaintiff Baker's project.

193.    Mr. Johnsen texted Plaintiff Baker inquiring who Ms. Piceau was and what relationship she had with Plaintiff Baker, leading to a strange volley of texts wherein Mr. Johnsen downplayed the significance and danced around his real reason for his inquiry.

194.    Plaintiff Baker subsequently contacted Ms. Piceau, who then explained to the extent possible due to a non-disclosure agreement with Sea World what had occurred.

195.    It was disconcerting for Plaintiff Baker to learn that Sea World was considering a project with her former production partner along with ATM and Defendants that was a knock-off of *Finney* in violation of not only the NDA that Defendants had executed with Plaintiff Baker, but also the non-disclosure/non-compete agreement that Sea World had executed with Plaintiff Baker.  In fact, Sea World's expressed prior interest to collaborate

with the *Finney* project for licensing/merchandising deals was one of the key components that had attracted Defendants to the *Finney* project in the first place.

196.    In May of 2016, at the Steve Irwin Gala event in Los Angeles, Plaintiff Baker was supposed to meet Bindi Irwin to discuss the *Finney* project; however, Plaintiff Baker was instead informed by Mrs. Irwin that the Irwins would not renew the letter of intent and that they had heard a lot of negative information about Plaintiff Baker and her project from "the men [Plaintiff Baker] had been working with in the past."

197.    Plaintiff Baker then received a letter from the Irwins' attorney requesting the immediate removal of Bindi Irwin from the *Finney* website.

198.    It is worth noting that the Irwins currently have a show on Animal Planet/Discovery called *Crikey!  It's the Irwins*.

199.    In 2017, Plaintiff Baker once again lined up a number of interested local/regional investors and production team for both the *Finney* short and feature films.  Conference calls with Mr. King and Mr. Rhein took place in advance of a meeting in downtown Cincinnati wherein Baker flew in Dan St. Pierre and her new team to meet with one of these groups of investors.  Excited and optimistic about her new prospects, Plaintiff Baker shared the positive news in good faith with her team and contacts at ATM.  Shortly thereafter, the investors rescinded their offers for then unclear reasons.

200.    Also beginning in 2016, Plaintiff Baker reached out to her close family friend, Diane Harrelson, mother to actor Woody Harrelson.  Ms. Harrelson lives in Lebanon, Ohio and attends the same church as Plaintiff Baker and her husband.  Ms. Harrelson reviewed the *Finney* script and thought so highly of it that she not only recommended it to her son, but

even hand-delivered a copy to Mr. Harrelson in 2017 when she visited him in London while he was filming *Solo: A Star Wars Story*.

201.    Mr. Harrelson, who had experience voicing animated characters, expressed interest in the storyline and eco-conscious themes and communicated through his mother to Plaintiff Baker requesting the *Finney* materials be submitted to his manager Tracy Harshman and his business partner Joe Hickey for their review, as they often screen his potential projects.

202.    In favor of the project and due to Mr. Harrelson's personal interest in the subject matter, Ms. Harshman and Mr. Hickey directed Plaintiff Baker to contact Mr. Harrelson's agent, Jeremy Plager at CAA, to formalize Mr. Harrelson's involvement with the *Finney* project, even suggesting that CAA could assist further by attaching other talent to further facilitate garnering studio interest.

203.    At the time, Plaintiff Baker was hesitant about reaching out to Mr. Plager because of she feared Defendant Skouras' threat to blacklist her with CAA among other talent agencies and film studios.   Plaintiff Baker believed that Defendant Skouras was fully capable of carrying out his threat because of the many connections he had with CAA, including Defendant Close, who worked for CAA for years before joining Excel.   Plaintiff Baker finally decided to reach out to Mr. Plager despite her trepidation, hoping that Defendant Skouras was making empty threats to intimidate and control her.

204.    Plaintiff Baker spoke to Mr. Plager's assistant[1] on multiple occasions and submitted the *Finney* materials for Mr. Plager's review.   According to his assistant, Mr. Plager was very

---

[1] Plaintiff Baker reached out to Mr. Plager through his assistant, who, at the time, was Maddy Dumont.   Upon information and belief, Mr. Plager got a new assistant shortly thereafter, Alexandra Kordas, who took over the communications with Plaintiff Baker on Mr. Plager's behalf.

pleased with the materials and he, too, suggested that CAA could help package the project and attach other talent to the project so that it could be presented to studios.

205.    Despite the positive response from Mr. Harrelson, his mother, his manager and his business partner in support of the *Finney* project, Mr. Plager, contrary to his own suggestion that CAA could help package and pitch the project, suddenly and inexplicably ceased all communication with Plaintiff Baker.  Upon information and belief, Plaintiff Baker's worst fear materialized: Defendant Skouras made good on his promise to blacklist her with CAA.

### **MISAPPROPRIATION OF TRADE SECRETS**

206.    Upon information and belief, from 2014 to 2017, Defendants made multiple efforts to unlawfully misappropriate Plaintiffs' *Finney* project and her related trade secrets.

207.    Defendants first acquired Plaintiffs' trade secrets in 2011 and 2012, including original scripts, business and marketing plans, book, artwork, pitch proposals, marketing plans, cast and talent lists, sponsor and investor lists, and promotional ideas, for which Defendants executed NDAs.

208.    Upon information and belief, Defendant Skouras arranged meetings with a variety of animation studios, producers, and celebrities to pursue the production of a knock-off version of the *Finney* project, as well as misappropriating other trade secrets, including, without limitation, promotional and merchandising ideas and game/app concepts from Plaintiffs' proprietary materials.

209.    Defendants' malicious intent to misuse, share and disclose Plaintiffs' trade secrets amounts to a misappropriation of those trade secrets under Ohio and New York law.

210.    Upon information and belief, Defendants not only improperly disseminated Plaintiffs' trade secrets, but also produced a knock-off version that they shopped around to various

third parties, including Sea World, Animal Planet/Discovery, Mammoth Vision, and an unnamed "Indian animation studio."

**CLAIM I**
**BREACH OF CONTRACT - NDA**
**(Against Defendants Skouras, BenSalz, Close and Excel)**

211.    Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

212.    At all times relevant to this litigation, Defendant BenSalz and Defendant Excel were in contractual relationships with Plaintiffs pursuant to the terms of the NDA.

213.    Under the terms of the NDA, Defendant BenSalz and Defendant Excel, and their respective employees and agents, including Defendant Skouras and Defendant Close, were required to obtain written non-disclosure agreements from any thirty-parties to whom Defendants disclosed Plaintiffs' proprietary and confidential information.

214.    Defendants breached the terms of the NDA by disclosing Plaintiffs' confidential and proprietary information without Plaintiffs' consent or authorization and without first obtaining a written non-disclosure agreement pursuant to the NDA's terms and conditions.

215.    Plaintiffs put Defendants on reasonable notice of their default under the NDA.

216.    Plaintiffs suffered damages as a direct and foreseeable consequence of Defendants' material breach of the NDA.

217.    Plaintiffs are entitled to damages in an amount to be determined at trial.

**CLAIM II**
**BREACH OF FIDUCIARY DUTY**
**(Against Defendants Skouras, BenSalz, Close and Excel)**

218.    Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

219.     At all times relevant to this litigation, Defendant BenSalz and Defendant Excel were in agency relationships with Plaintiffs and owed a duty to Plaintiffs to act in good faith and deal fairly with them.

220.     Defendant BenSalz and Defendant Excel, through the actions of Defendant Skouras and Defendant Close, breached their fiduciary duties to Plaintiffs by failing to represent Plaintiffs' best interests as agents and business partners, and failing to be truthful in their dealings with Plaintiffs.

221.     Plaintiffs suffered damages as a direct and foreseeable consequence of Defendants' breach of their fiduciary duties.

222.     Plaintiffs are entitled to damages in an amount to be determined at trial.

### CLAIM III
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (Against Defendants Skouras, BenSalz, Close and Excel)

223.     Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

224.     At all times relevant to this litigation, Defendant BenSalz and Defendant Excel knew of the existence and the terms of the valid contract between Plaintiffs and ATM.

225.     At all times relevant to this litigation, Defendant BenSalz and Defendant Excel knew of the existence of business relationships between Plaintiffs and various parties as described above in the factual allegations to this Complaint.

226.     Defendant BenSalz and Defendant Excel, through the acts of Defendant Skouras and Defendant Close, intentionally and improperly procured the breach of ATM's contract as well as sabotaged and interfered with Plaintiffs' business relationships, including by seeking confidential information from ATM without Plaintiffs' consent and working with ATM and

others to undermine Plaintiffs' efforts to establish business relationship with various third-parties.

227.     Defendants' acts were improper because such acts induced ATM to violate the terms of its agreement with Plaintiffs, as well as prevented or disrupted the business relationships that Plaintiffs had with various third-parties.

228.     Plaintiffs suffered significant damage as a result of this interference with their business relationships.

229.     Plaintiffs are entitled to damages in an amount to be determined at trial.

230.     Defendants engaged in conduct that was wanton and in reckless and knowing disregard of Plaintiffs' rights.

**CLAIM IV**
**MISAPPROPRIATION OF TRADE SECRETS**
**(Against Defendants Skouras, BenSalz, Close and Excel)**

231.     Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

232.     At all times relevant to this litigation, Defendant BenSalz and Defendant Excel were in contractual relationships with Plaintiffs and owed a duty to Plaintiffs to act in good faith and deal fairly with them.

233.     Under the terms of the NDA, Defendant BenSalz and Defendant Excel were required to obtain written non-disclosure agreements from any thirty-parties to whom Defendants disclosed Plaintiffs' proprietary and confidential information.

234.     Defendant BenSalz and Defendant Excel, through the actions of Defendant Skouras and Defendant Close, misappropriated Plaintiffs' confidential and proprietary information without consent or permission from Plaintiffs in violation of the NDA, as well as, upon

information and belief, by attempting to make use of such confidential and proprietary information for their personal gains in violation of Ohio's Uniform Trade Secrets Act.

235.     Plaintiffs suffered damages as a direct and foreseeable consequence of Defendants' misappropriation of her confidential and proprietary information.

236.     Plaintiffs are entitled to damages in an amount to be determined at trial.

**CLAIM V**
**VIOLATION OF DEFEND TRADE SECRETS ACT**
**(Against Defendants Skouras, BenSalz, Close and Excel)**

237.     Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

238.     Defendant BenSalz and Defendant Excel, through the actions of Defendant Skouras and Defendant Close, misappropriated Plaintiffs' confidential and proprietary information without consent or permission from Plaintiffs, as well as, upon information and belief, by attempting to make use of such confidential and proprietary information for their personal gains in violation of the Defendant Trade Secrets Act of 2016.

239.     Plaintiffs suffered damages as a direct and foreseeable consequence of Defendants' misappropriation of her confidential and proprietary information.

240.     Plaintiffs are entitled to damages in an amount to be determined at trial.

**CLAIM VI**
**CRIME OF VIOLENCE MOTIVATE BY GENDER – NEW YORK CITY VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION ACT**
**N.Y.C. Admin. Code § 8-901 et seq.**
**(Against Defendant Skouras)**

241.     Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

242. Defendant Skouras' acts described above violate Section 8-904 of the New York City Administrative Code.

243. Specifically, by sexually assaulting Plaintiff Baker, Defendant Skouras has engaged in crimes of violence as defined in the New York City Administrative Code § 8-903.

244. Defendant Skouras's crimes of violence were motivated by Plaintiff Baker's gender as defined in the New York City Administrative Code § 8-903, as evidenced by the facts set forth above, Defendant Skouras's ongoing threats, apparent excitement at Plaintiff Baker's discomfort at his sexually aggressive behavior, and the forceful and cruel way that he treated her.

245. As a result of Defendant Skouras's crimes of violence motivate by gender against Plaintiff Baker, Plaintiff Baker has been damaged and is entitled to compensatory damages in an amount to be determined at trial and to attorney's fees and costs.

246. Defendant Skouras's actions in violation of the New York City Victims of Gender-Motivated Violence Protection Act were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff Baker's rights, for which she is entitled to an award of punitive damages.

**CLAIM VII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Defendants Skouras and BenSalz)**

247. Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

248. The conduct of Defendant Skouras complained of herein was extreme and outrageous. Defendant Skouras intentionally caused Plaintiffs emotional distress by (a) sabotaging Plaintiffs' efforts to produce the Finney film; (b) blacklisting Plaintiffs with major

studios and talent agencies; (c) tortuously interfering with Plaintiffs' business relationships; (d) threatening Plaintiff Baker with personal and physical harm; (e) sexually harassing Plaintiff Baker; (f) misappropriating Plaintffs' proprietary and confidential information; (g)

249. At all times relevant to this litigation, Defendant Skouras was an agent and/or employee of Defendant BenSalz. Defendant BenSalz supervised and controlled Defendant Skouras when Defendant Skouras engaged in his unlawful conduct in the course and scope of his employment with Defendant BenSalz.

250. Defendant Skouras took the aforementioned actions with reckless disregard of Plaintiff Baker's emotional well-being.

251. As a result of Defendants' conduct, Plaintiffs suffered legally compensable emotional distress damages.

252. Defendant Skouras's wrongful acts were foreseeable and Defendant BenSalz knew or should have known of the wrongful acts. Defendant BenSalz is liable for the wrongful conduct of Defendant Skouras under the law of vicarious liability, including the doctrine of respondeat superior.

<u>**CLAIM VIII**</u>
<u>**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**</u>
**(Against All Defendants)**

253. Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

254. Defendants owed a duty to Plaintiffs to act as reasonable, prudent persons. This duty includes an obligation to act in a careful, lawful and prudent manner and in full compliance with applicable law.

255. Defendants' conduct toward Plaintiffs resulted in a breach of Defendants' duties to act as reasonable, prudent persons.

256. Emotional distress was a field of danger that Defendants should reasonably have anticipated and guarded against.

257. As a result of Defendants' breach of their duties, Plaintiffs have suffered legally compensable emotional distress damages.

### CLAIM IX
### VICARIOUS LIABILITY
**(Against Defendant Fox)**

258. Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

259. At all times relevant to this litigation, Defendant Skouras was an agent and/or employee of Defendant Fox. Defendant Fox supervised and controlled Defendant Skouras when Defendant Skouras engaged in his unlawful conduct in the course and scope of his employment with Defendant Fox.

260. Defendant Skouras's wrongful acts were foreseeable and Defendant Fox knew or should have known of the wrongful acts. Defendant Fox is liable for the wrongful conduct of Defendant Skouras under the law of vicarious liability, including the doctrine of respondeat superior.

### CLAIM X
### PUNITIVE DAMAGES
**(Against All Defendants)**

261. Plaintiffs re-alleges and incorporate by reference the preceding paragraphs as if fully restated herein.

262. The conduct of Defendants as described in this Complaint was oppressive, intentional, reckless, and malicious, thus entitling Plaintiffs to an award of punitive damages in an amount appropriate to punish and make an example of Defendants.

WHEREFORE, Plaintiffs respectfully request judgment against all Defendants, jointly and severally, for the following:

A. Compensatory damages according to proof;

B. Consequential damages according to proof;

C. Incidental damages;

D. Punitive damages;

E. Attorney's fees and costs;

F. Pre- and post-judgment interest on all amounts as permitted by law at the highest legal rate from and after the date of service of the Complaint in this action; and such other further relief as the Court considers just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ John Hui Li
John (Hui) Li (OH#0082661)
HORENSTEIN NICHOLSON & BLUMENTHAL LPA
124 E. 3rd Street, Suite 500
Dayton, Ohio 45402
Telephone: 937-224-7200
Facsimile: 937-224-3353
jli@hnb-law.com

*Trial Attorney for Plaintiffs*