UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
BELINDA BAKER,
STARBORNE PRODUCTIONS, LLC,
and, STARBREACHER ENTERPRISES LLC,

                  Plaintiffs,          20 CV 3342 (AJN) (SN)

        -against-

BENSALZ PRODUCTIONS LLC,        **SECOND AMENDED COMPLAINT**
EXCEL SPORTS MANAGEMENT LLC,
and, MICHAEL SKOURAS,

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        Plaintiffs Belinda Baker, Starborne Productions, LLC, and Starbreacher

Enterprises, LLC, by counsel, as and for their Second Amended Complaint, hereby allege upon

information and belief as follows:

## PARTIES, VENUE and JURISDICTION

        1.      At all times hereinafter mentioned, plaintiff Belinda Baker was an adult

resident of Warren County, in the State of Ohio.

        2.      Plaintiff Starborne Productions, LLC ("Starborne") is a limited liability

company organized under the laws of Ohio with its principal place of business in Warren County,

Ohio.

        3.      Plaintiff Starbreacher Enterprises, LLC ("Starbreacher") is a limited

liability company organized under the laws of Ohio with its principal place of business in Warren

County, Ohio.

        4.      Defendant BenSalz Productions, LLC ("BenSalz"), is a limited liability

company organized under the laws of New York with its principal place of business in New York

County, New York.

5.      Defendant Excel Sports Management LLC ("Excel") is a limited liability company organized under the laws of Delaware with its principal place of business in New York County, New York.

6.      Defendant Michael Skouras is an individual domiciled in New York County, New York, and was, at all relevant times herein, an owner, member, employee, or agent of BenSalz.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

8.      Venue is properly laid in the Southern District of New York, pursuant to 28 U.S.C. Section 1391, et seq., as it is the district where the corporate defendants reside, and where a substantial amount of the events and conduct at issue occurred.

**RELEVANT FACTS**

Relationship Between the Parties

9.       In, about, and after the year 2000, plaintiff Baker developed her story and character Finney the Star Breacher and the surrounding world within which Finney lived ("Finney"), around whom she wrote a book that was published in 2010. During this period of time she also began drafting a potential movie script, surrounding character designs, artwork and design, and other, similar works concerning Finney and prospecting potential talent, production partners, studios and investors for the creation of potential movie.. The Finney-related materials are referred to herein as the Finney intellectual property ("Finney IP").

10.     Baker was the sole owner of the rights to the Finney IP.

11.    In or around 2006, Baker formed Starborne and Starbreacher, with the expectation that these limited liability companies would play particular roles with respect to the development of Finney and the ownership of the Finney IP..

12.    Baker is the sole shareholder of both Starborne and Starbreacher. For the remainder of this pleading the terms "Baker" and "plaintiffs" are used interchangeably.

13.    In the years that passed, Belinda Baker expended untold dollars and countless hours of hard work developing and Finney and marketing the property to potential partners, investors, and other entities who might be interested in licensing or promotional deals.

14.    In sum, Finney the Star Breacher is an inspiring children's story about a very gifted dolphin who embarks on a classic hero's journey with timely conservation themes. Finney was brought to these Defendants with prior attached voice talent like Jack Hanna, the Director Emeritus of the Columbus Zoo and others, the support and interest from acclaimed animation producers like George Johnsen and Mark Baldo, and interest from various studios and an array of marketing partners and other interested parties.

15.    In 2007, Baker, via Starborne, entered into an agreement with Acrylic Tank Manufacturing ("ATM") to create children's aquariums, inserts and figurines based on Finney.

16.    ATM and plaintiffs entered into a licensing/merchandising agreement by which ATM was to pursue celebrity voice actors, and potential sponsors and investors for a proposed animated feature film that plaintiffs had been developing based on the Finney book and script plaintiff Baker had written. Over the following years, ATM and plaintiffs continued to discuss ATM promoting Finney on Tanked, ATM's reality cable television show that debuted on

the Animal Planet/Discovery network in 2011.

17.     Finney the Star Breacher was an extremely well-received, commercially viable property. Before, and in the years since plaintiffs' dealings with the defendants, Baker had acquired interest and support from an array of film industry professionals, high level talent, potential private investors, and corporate marketing partners, such as Sea World, Pepsi, Toyota, and Procter & Gamble, and leading conservation icons such as Jack Hanna and Bindi Irwin, and many others.

18.     One longtime supporter of the project was Baker's business associate and production partner, the award-winning animation producer George Johnsen, who was the CEO of Mammoth Sound and Vision ("Mammoth") in Burbank, California.

19.     Johnson was very interested in the Finney project and so, in mid-2011, Mammoth entered into a memorandum of understanding with Clemensen Capital Corporation ("CCC) by which it was agreed that CCC would provide 50% of the funding for the production of the Finney project, with the understanding that the production budget would be  $40 million.

20.     In 2011, ATM's CEO, Wayde King, introduced Baker to BenSalz. More precisely, he introduced her to Mike Skouras. Skouras, an owner of BenSalz, was both a producer and the creator of Tanked. Upon information and belief, defendants BenSalz and Skouras were also serving as the talent agent for the stars of Tanked.

21.     Skouras expressed an immediate interest in representing plaintiffs with respect to developing Finney into an animated feature film. Upon information and belief, Skouras shared details about the Finney project with his two partners at BenSalz, defendants Richard Bennett and Eric Salzman, as well as his superiors and colleagues at Fox about their potential

involvement and received positive responses.

22.    Skouras was also employed by Fox News, or one of the Fox companies owned at that time by 21st Century Fox (generally referred to herein as "Fox"). Skouras expressly stated to plaintiffs that he could and would use his position within Fox to secure financing and voice and musical talent for the project. He further promised that he would be able to use his connections through Fox to promote the film before, during  and after production and release.

23.    Over the course of the summer and fall of 2011, Skouras informed Baker that he had presented Finney to various people in the television and film industry,  including  his "inside contacts" at DreamWorks and Fox, and had presented them with plaintiffs' existing Finney materials, including the script, book, artwork, marketing plans, and computer renderings.

24.    Thus, by mid-summer 2011, plaintiffs had received extremely positive feedback from various industry veterans, already had a licensing agreement in place with ATM (who was in the process of launching their show Tanked), and had secured $20 million in funding for the production of the Finney project. Moreover, Skouras was advising plaintiffs that he was receiving very encouraging responses from insiders at major studios

25.    At or about this time, upon information and belief, Skouras shared details about the Finney project with Casey Close, who was, and is, an owner and employee of Excel, a talent agency whose primary clients are professional athletes. Close was, and is, also the husband of Gretchen Carlson, whom Skouras knew and worked with at Fox.

26.    Skouras advised that Close was very interested in representing Baker, and proposed partnering with Excel as talent agents and business partners, and arranged for numerous

meetings with Close and Excel's marketing team. To facilitate Excel's involvement, Skouras

provided Excel with plaintiffs' Finney IP and suggested that Excel act as the lead agent for

plaintiffs and the Finney project.

27.     To induce Baker to consent to bringing on Excel as a talent agent and

partner, Skouras repeatedly stated that he and Close, despite the absence of a written agreement

between the parties, were communicating with studios and individuals in the entertainment and

movie industry about plaintiffs' project and were receiving overwhelmingly positive feedback

about the Finney project.

28.     By way of example, on or about September 23, 2011, Skouras emailed

Baker, "Just heard from Casey and it was all positive. He is very tied up w/the playoffs right

now; (he represents people like Derek Jeter of the NY Yankees, Ryan Howard of the Phillies--top

names in the game). He asked for another week or 2 to continue to work on this and see what his

marketing people can do as far as a marketable plan to Dreamworks, etc. I am inclined to give

him the time. He knows the players, is friends w/ Spielberg--he's a top flight asset and if we can

get him on board I would like to do so. I know this is killing you B but be patient for a bit

longer--I think this is all falling into place!"

29.     On October 6, 2011, Skouras emailed Baker, "I did hear from the head of

Casey's marketing team yesterday and she asked me for a little more info and said she was still

looking at potential clients of theirs that would be a good fit for Finney."

30.     On October 24, 2011, Skouras emailed Baker, "Yes, Spielberg is waiting

for an agent, (Casey) to formally present it but he knows about the project and will look at it

"officially" when given. My contact at Dreamworks already spoke to him about it. The Rabo

people that raise the capital for Village said they are interested to hear more and asked that we

don't make any decisions until they see everything."

31.     Premised on the defendants' contacts throughout the industry and already-

ongoing, enthusiastic promotion of plaintiffs' project, Baker understandably agreed that BenSalz

should bring Excel on board.

32.     On October 31, 2011, Skouras emailed Baker, "My mtg. w/Casey and his

team went very well and he is in fact signing on to rep Finney! His plan is to team up w/ a

Hollywood agency like CAA or IMG if he feels the need. However, he has already reached out to

contacts at the studios and independent producers to get a feel for the project. He also wants to

make sure that we are not a script that sits on someone's desk for the next 10 years before it's

made! The next few weeks we will have to get some paperwork in order. I will have my att'y

draft something that officially brings me on board. We will also have to do a NDA when the

script goes out but that is something I will handle. The order of business after that is a mtg.

w/Casey the week after Thanksgiving. His team is packaging the proposal right now and will

present it to me at that time. He will also let me know who they are going to formally present it to

for my review. The plan is to have some serious interest generated by the early part of 2012 so

that we can move forward w/ a concrete plan and a studio behind the project. I think this is a

HUGE step forward and I hope you are all pleased! I will be in touch as we proceed but enjoy

this moment for now and hopefully this is the start of bringing Finney to life!"

33.     Plaintiffs were concerned about the absence of a formal written contract

memorializing the terms of the agreement, and said so to the defendants. In response they were

told that a writing would be drafted. Notwithstanding the many subsequent emails, texts and oral

assurances that writing was forthcoming, it was never was provided. However, Excel and Close had clearly and unambiguously promised to proceed as the agent for Baker, was acting and continued to act in their capacity as plaintiffs' agent, and plaintiffs reasonably relied upon these claims and promises.

34.    On November 16, 2011, Skouras emailed Baker to confirm that his attorney would be drafting an agreement. He also stated that Close and Excel would have their lawyers draft an agreement for them as well. He also stated that Close would not be satisfied with merely taking an agent's commission. More precisely, Skouras wrote, "My att'y did say that she has something drawn up. As soon as I can get a free minute I will see what she has come up w/ and send it along so we can figure this all out going forward. Casey will undoubtedly have something for him and his firm. What this is I will not know until he gives me something. However, I am sure he will want something on the backend since it is, as you mentioned where the "real" money comes in. Sequels, books, video games--he'll want to be included but that means he will also take care of all these things which believe me is a blessing!"

35.    Shortly thereafter, Close told Baker that Excel would be able to secure a deal for the Finney project in short order, which would include pursuing major film studio production and participation as well as signing star voice talent, and procuring a funding deal and/or sale of the Finney IP.

36.    On or about December 2, 2011, BenSalz and plaintiffs entered into a written co-executive producer contract setting forth the terms by which BenSalz would serve as co-executive producer for the Finney project and how it would be compensated for its services (the "BenSalz contract").

37.     The BenSalz contract was authored entirely by BenSalz.

38.     Nowhere in the BenSalz contract was there a provision concerning how either party could withdraw from the contract, nor was there a provision identifying a time frame or end date for the contract. In short, the contract was open-ended as to its duration and silent as to its termination or the rights of any of the parties in the event of an attempted termination.

39.     On December 12, 2011, BenSalz, through and by Richard Bennett, executed a Non-Disclosure Confidentiality Agreement ("NDA") which plaintiffs had insisted upon. Skouras also executed the NDA, albeit not until January 2012.

40.     On or about December 19, 2011, plaintiff Baker traveled to New York City for the purpose of meeting with Skouras and Close in person.

41.     Baker continued to express to Excel her concerns about confidentiality and that BenSalz and Excel were not properly protecting and documenting all disseminations and discussions of the Finney IP with outside third parties. Stirling Fiss, an employee of Excel, assured Baker that Excel would abide by the same NDA as BenSalz and requested Baker send Excel a copy for execution. Fiss further advised Baker that Excel would remind Skouras of the importance of adhering to the NDA as well.

42.     The need to have confidentiality agreements with third-party recipients of the Finney materials was self-evident, as Skouras noted in an email on October 13, 2011, where he wrote, "Also, I plan on having anyone we talk to on our end sign a confidentiality agreement (we have one we use routinely and Im sure Excel does too) or if you prefer, you can send us yours to use… but might be good to run it past our attorney Nicole Page first. Just let me know."

43.     Based on statements such as these by Skouras, plaintiffs were under the

impression that not only were the defendants aware of the need for NDAs, but would ensure that they were obtained to protect the integrity of the Finney IP.

44.     During the course of the meeting between the parties on December 20, 2011, Close reiterated that he was excited about taking on the plaintiffs as his first non-sports clients, and that Excel would aggressively seek a deal for the Finney project and solicit a sale of the Finney IP or co-production financing and or studio distribution opportunities. Excel was well-positioned to do this, Close stated, because he would cultivate his own connections as well as pursue any and all leads his partners at BenSalz provided or that the plaintiffs provided. C

45.     Close promised that he and his team at Excel would work to expedite a deal for her movie, and stated that having Excel as Baker's talent agents would provide the added security, credibility and benefits of their top tier connections, as well as easy access to and perceived prestige with major studio and talent prospects, prospective investors, buyers or marketing partners and ensure the project and plaintiffs' success.

46.     Baker made clear to the defendants her concerns about protecting her IP or otherwise being victimized by the power imbalance that ordinarily exists between aspiring writers (particularly those without proper representation) and studios and investors. To persuade her to proceed with BenSalz and Excel as her partners, co-producers, and agents, the defendants agreed they were in a "relationship dependent industry where reputations and inside connections are everything" and where "projects and aspiring talent can struggle for years or even decades before getting a break," and sometimes it "just takes the right person with the right contacts." However, they assured her Casey Close was the very person plaintiffs needed to protect their interests in a sea of predators.

10

47.     Close stated he would expedite Excel's efforts, saying he believed a deal for the Finney film could be struck in a "New York minute" and assured Baker that a deal with a "studio would be secured by the first quarter of 2012" and that Excel would guide Baker safely through the process while protecting the Finney IP.

48.     This was a point Skouras underscored when he later stated to Baker, "no one steals from [Close]" and that Close had access to major executives and decision makers at the studios and agencies like CAA and IMG, as well as a long list of major Hollywood figures with whom he was close friends, including Steven Spielberg. The defendants further informed Baker that Close were already talking privately to many of them about the project and sharing Baker's script.

49.     For example, on June 25, 2012, Skouras wrote, "I sent Casey my comments and expect to hear from him as soon as he has reviewed the proposal in the next few days. He also has contacts at SONY and we still anticipate a call from Dreamworks." Four days later, Skouras wrote, "Casey still reviewing. He has calls out to his studio pals!"

50.     During and after the December meeting, Close continued to tell Baker he would be able to help package the project and coordinate such efforts with both defendants' connections at the major film studios, private investors, investment banks and other talent agencies, including powerhouses IMG and CAA where Close used to work and said he "still had extensive contacts."

51.     Close's statements about working with IMG and CAA confirmed earlier statements by Skouras in which he told Baker that Close had already reached out to his contacts at the studios and independent producers to discuss the project, and that Close would bring in an

IMG or CAA if it would be helpful to package the project.

      52.    During the course of the December 2011, meeting, and in subsequent

communications, the defendants acknowledged that even the minimum Writers Guild of America

guaranteed fees paid to a story creator and scriptwriter for a $40M project like Finney, coupled

with Baker's executive producer fees, would have earned Baker a seven-figure salary, and that it

was their job as her agents to do their best in representing her and her IP to solicit and secure

co-production, or a sale or funding deal, or other income generating work for her as the

writer-creator of Finney as expediently and professionally as possible.

      53.    The defendants raised with Baker that, if one of the major studios came on

board, it would be feasible to double the production budget, as the going rate for animated films

being produced by the major studios at that time was $80M or more. Thus, the defendants asked

Baker to prepare alternative budgets and profit projections and revise certain pitch materials to

have ready should one of the bigger studios show interest in a larger budgeted project.

Sexual Assault

      54.    In December 2011, after the parties agreed on the agency relationships

between plaintiffs and defendants, Baker flew from Ohio to New York City to meet the various

defendants in person.  While there, Baker was sexually harassed and assaulted by Skouras.

      55.    With the formal meeting scheduled for December 20, Skouras invited

Baker to meet him in New York City on December 19 for a tour of Fox's offices.

      56.    Skouras subjected Baker to inappropriate banter and sexual advances

almost immediately at their initial meeting at Fox headquarters, and carried on throughout the

day. Initially flippant, Skouras became more aggressive, pushy and suggestive over the course of

12

the day. Skouras asked about Baker's relationship status while commenting that she was very attractive and wondering if she was single or ever "fooled around," whether she was traveling alone, and how long she was staying in New York. He also told Baker that she was welcome to stay with him during her visit, that she didn't look like a typical book writer, and, in a reference to Fox's roster of blonde female on-air talent, that she could "fit right in with the Foxy ladies."

57.     Baker found these comments and questions inappropriate and was increasingly uncomfortable. At the same time, the plaintiffs had just entered into a contract with BenSalz and Baker understood that she would both be working with and relying heavily on Skouras to sell the Finney project. She attempted to tactfully discourage his conduct by explaining that she was married and a Christian, and that she did not engage in this sort of behavior, while redirecting their conversations. Skouras shrugged off Baker's comments, suggesting that being from Ohio, she was simply naive and "didn't know" that "using one's looks and sleeping around was how many women got ahead in the entertainment industry."

58.     During their conversation on the walk over to Excel's office, and while waiting for Close, Skouras repeatedly petted and pawed at Baker in a highly sexually suggestive manner that was both demeaning and demoralizing, rubbing and pinching her arms, patting at her legs and squeezing on her shoulders, and, at one point, purposefully running his hand across her breast. At the same time Skouras was touting his connections throughout Fox and explaining that if Baker were "nice" to him that he would pursue additional support for her projects and career and obtain promotional participation from Fox in a number of ways.

59.     Skouras dispatched with all pretense when he and Baker were alone in an elevator on their way up to Excel's office when he forcibly pushed himself against Baker from

behind and rubbed his groin up against her.  When Baker moved forward trying to escape, she stumbled and Skouras reached out and grabbed her crotch and groped her buttocks.

60.     This stunning assault was done with such force in his grip as to cause bruising. It also caused Baker to twist her back, which exacerbated a previous injury and led to subsequent back, leg, and nerve pain, numbness and muscle spasms.

61.     Baker is a survivor of traumatic childhood sexual assault, leaving her with post-traumatic stress disorder ("PTSD"), which were triggered and exacerbated by Skouras' assault and incessant sexualized conduct throughout the day. This conduct amplified her emotional distress and its psychological and physical manifestations. She still suffers from these traumas.

62.     After the meeting, Skouras continued to hound Baker, asking her to go grab a drink with him or meet later for dinner that night or the next.  On their walk back towards the Fox News headquarters, Skouras tried to escort Baker back to her hotel, before returning to asking if he could stop by her room to discuss their burgeoning working relationship.  His relentless pressure made clear that Skours wanted sexual favors from Baker, which he was tying to his willingness to assist her professionally.

Post-December 2011 Events

63.     As of the beginning of 2012, in view of Mammoth Sound and Vision's deal with CCC, plaintiffs had in pocket a commitment from CCC to fund up to $20M to produce the Finney project. In view of an anticipated budget of $40M, it was incumbent on the defendants as co-producers and talent agents to secure the additional funding through investors or otherwise persuade a larger studio to undertake the production. Alternatively, the defendants could have

14

sought to package and sell the rights to plaintiffs' IP.

64.    As the Defendants began actively working with the Plaintiff in 2012, they first focused on the creation of a shorter pitch package, which included such things as Baker working with a graphics designer who was referred by Excel but paid for by Baker, as well as providing the source materials, expending her time on research and development, as well as the writing and editing for the new long and short form pitch packet, and revising film budgets, extensive production bible, marketing pitch book, prospectus, new promotional demo reels.

65.    By mid-May 2012, Skouras informed Baker that both he and BenSalz and Excel had signed off on this new pitch packet–which listed the defendants as partners in the project--and that they would be sending said pitch and scripts out the following Monday to Disney, Dreamworks, Sony, MGM, Paramount, Blue Sky, and purportedly several other studios and prospects.

66.    Notwithstanding her repeated requests, Baker was never included in calls with these prospects, nor was she copied on any of the emails or communications concerning the sharing of her IP. And Baker was never provided any evidence that her proposals, scripts, or IP were actually sent to the prospects with whom the defendants had told her they were communicating.

67.    Throughout the course of their communications in 2011, Baker insisted to Skouras that it was imperative that NDAs be executed by everyone with access to the IP.

68.    Skouras seemingly agreed, acknowledging to Baker in 2011 that it was essential because ideas and intellectual property were routinely stolen, and that the industry was nasty and brutish in this regard.

69.     Under the terms of the NDA that Bennett and Skouras signed, and which Excel agreed to adopt, the defendants were obligated not to discuss or otherwise disclose any of plaintiffs' IP to any third-parties without the express written approval of Baker in advance of such disclosures. Moreover, the defendants were obligated under the NDA to disclose to Baker the names and contact information of any persons or companies with whom the IP had been or would likely be shared. The NDA was retroactive to July 1, 2011.

70.     The defendants continued to represent to plaintiffs throughout 2011 and 2012 that they were speaking with various major studios and influential insiders–such as Steven Spielberg and Harvey Weinstein–about Finney, and that there was serious interest.

71.     At the same time the defendants continuously refused to abide by the NDA. They often did not obtain Baker's approval prior to these communications–and most certainly did not do so prior to Skouras discussing the project with his connections–nor did they provide her with the appropriate details after-the-fact. These consistent failure to adhere to the NDA was contrary to standard industry protocol used by most major studios, agents and producers to protect one's IP. Needless to say, the defendants never once obtained a corresponding NDA from any of the persons or entities with whom they shared plaintiffs' IP.

72.     In the interim, Baker's own efforts and contacts, plaintiffs learned that there was strong interest in producing and partnering on the project from Arc Productions, which was at that time a successful animation studio based in Toronto.

73.     Baker informed the defendants of Arc's interest and connected them with Arc's CEO, Jeff Young. Arc then made a bid on the production and partial funding of the film. While Arc's proposal independently would not have been sufficient to fully fund the project,

when coupled with the commitment by CCC through Mammoth, there was now ample money available.

74.     Notwithstanding the interest of Arc and Mammoth, the defendants failed to follow through. Rather, the defendants allowed these viable leads to languish, as they did with any Baker's other suggested leads.

75.     Under the terms of the contract between plaintiffs and BenSalz, the latter was entitled, in relevant part, to a finder's fee of ten percent (10%) of whatever financing BenSalz was responsible for obtaining. Had the Finney project proceed with either or both Arc and/or Mammoth, or with any other funding procured by Baker, BenSalz would not be entitled to any compensation for the procurement of those monies.

76.     Baker also spoke with Excel about securing a publisher for a book based on the Finney IP, and was told Excel would engage another representative to assist in her efforts. The idea was that book would be a companion piece to the movie and part of the larger merchandising and branding of the Finney product.

77.     Excel was also supposed to approach its roster of high profile sports stars about voicing characters and to procure corporate marketing partnerships for the film.

78.     Upon information and belief, despite Close's repeated promises to utilize Excel's clientele and connections to obtain voice talent, marketing partnerships, and the like, upon which plaintiffs had relied in agreeing to work with Close and Excel, neither never made any tangible effort to follow through on any of these actions, all of which were their duty and obligation as plaintiffs' representative and in accordance with Close's repeated promises.

79.     As plaintiffs did not discover until later, while the defendants were

repeatedly assuring Baker that they were in conversations with a variety of major studios and possible investors and receiving favorable responses such that funding was all but guaranteed, the apparent truth was that the defendants were doing nothing of the sort.

80.     The defendants continued to provide Baker with information leading her to believe that progress with their contacts was being made. For example, on August 14, 2012, Skouras texted plaintiffs, "As I told you guys before, via my inside top contacts at Fox, got Belinda's script and the whole pckge to the CEO of Blue Sky… last I heard, he likes the idea of a dolphin hero, impressed w/the package and is interested so will review and get back to us but if they get on board, they will do all the animation." Nothing further was heard from Skouras in this regard. As the defendants refused to identify the people they were allegedly communicating with or copy Baker on the exchanges, Baker had no way of confirming Skouras' claims.

81.     There was one studio, where defendants did appear to have an inside connection, or at least a connection to somebody with a connection. That studio was Village Roadshow Pictures ("VRP").

82.     BenSalz owner Richard Bennett had previously worked at RaboBank, where, upon information and belief, he came to know RaboBank's Jeff Bazoian.

83.     During the course of 2012, plaintiffs came to learn that RaboBank was providing VRP with approximately $1B in financing. Plaintiffs were advised that defendants had shared the Finney IP with Bazoian, with the expectation that he would present it to VRP's Bruce Berman.

84.     On May 23, 2012, Skouras emailed Baker, "Village has the proposal and we will follow up w/ them. It went directly to the CEO of Village handed to him by Stirling and

the head of Rabo--they are good friends. Same w/Spielberg/Dreamworks. If we do not hear from them after the holiday we will follow up w/everyone."

85.    Bazoian's incentive to involve himself in this product pitch was unclear, as plaintiffs had no relationship with him or RaboBank or Bazoian, nor were either involved in the film industry. And, to the best of plaintiffs knowledge, Jeff Bazoian has never been a licensed talent agent and anyone who procures, pitches solicits work for writers such as Baker must be licensed under New York law.

86.    At the same time, plaintiffs still had not received a written contract from Excel. This was worrisome in that they were working as plaintiffs' agent, which meant that Excel ought to be limited to an industry standard contingency fee but there were no expressly agreed to terms. Moreover, Skouras had made clear that Close expected additional monies on the back end, even though the amounts or basis for such compensation had never been discussed. Baker was concerned about why Excel was stalling with respect to reducing their relationship to writing, why Skouras and BenSalz were not insisting on such a writing from Excel, and, ultimately the motivations of Close, Skouras, Excel and BenSalz.

87.    Still, with defendants stating in May 2012 that the CEO of Village had already received the proposal, plaintiffs' hopes were buoyed, at least temporarily.

88.    As 2012 unfolded, Baker became increasingly concerned. The defendants had repeatedly stated that they were in the middle of positive discussions with various studios and individuals, but refused to keep Baker informed, and attacked her verbally when she pressed for details and confirmation. The defendants were also ignoring the pending, concrete offers from Arc and Mammoth/CCC without explanation.

89.     Despite her misgivings, Baker was persuaded to support the defendants and their supposed efforts with RaboBank. On September 15, 2012, Skouras emailed plaintiffs, in relevant part, "Having Bruce Berman PERSONALLY request the script is beyond huge! It is what I have been working towards all this time. He has read it, to what extent I do not know, but he does want to speak to Casey. Having my partner Rich know the banker who has given Village a 1 billion dollar line of credit is also a big plus! If nothing else, we are working on a deal to have Village distribute the movie and advise on the script. This is all going exactly to plan--let's stay the course!"

90.     For their part, Close and Excel advised plaintiffs throughout October that Baker should leave the discussions to Close and others, and that they would pursue the deal with VRP.

91.     Baker was increasingly concerned about the ongoing delays and lack of transparency, and so she contacted Bruce Berman's assistant, who advised that Berman had not seen her script and suggested Baker forward it to VRP's Vice President of Production, Matt Skiena, which Baker then did. As it turned out, her concerns were well founded.

92.     On November 2, 2012, Skiena emailed Baker in response, "Dear Belinda, Thanks for letting me take a look at FINNEY: THE STAR BREACHER. I see what you love about the project, but it is unfortunately not the right project for us. We wish you the best of luck with its pursuit, and thank you for thinking of us. Warm regards, Matt."

93.     Baker promptly replied, "Thanks so much for informing me. So sorry to receive your email today but I am a bit perplexed as just last week my associates indicated that Bruce had read the script, spoken with Jeff and that there was interest in the project. In fact, I was

just in receipt of email from my agent's assistant that she was going to reach out next week to try to set up a call between Casey and Bruce to discuss Village's interest in the project further, talk about potential co-financing and/or distribution options, logistics and next steps, etc. Could there possibly have been some kind of miscommunication then or crossed signals? Just wondering. We would certainly like to continue discussions if possible and share some additional ideas my partners have that might be of interest to Village Road Show, etc. If that is at all possible, please let me know."

94.    On November 4, 2012, Skiena replied simply, "You should discuss any confusion with your associates, as it sounds like there is a miscommunication somewhere on your end. Thank you again for giving us the opportunity to evaluate the project."

95.    Skiena's emails made clear that defendants' representations throughout 2012 to the effect that they–through or in conjunction with Bazoian–had communicated with Bruce Berman and VRP, had given him the Finney proposal, had given over the script (at Berman's request, supposedly), and were, as of October 2012, in the process of scheduling further conferences to discuss next steps, were entirely false in every regard.

96.    Upon learning that Baker had contacted VRP directly, Skouras erupted. Throughout the year Skouras had treated Baker contemptuously, berating and insulting her, calling her "bat shit crazy," saying she was "clueless and unfit for the business" and that her desire for updates was "nonsense" whenever she asked questions or asked for information about the defendants' supposedly ongoing discussions. Skouras threatened repeatedly over a period of many months to walk away or that he would destroy or "crush" the Finney project and Baker's reputation. He stated that he would contact every studio that defendants had communicated with

about Finney and let them know not to touch the project or work with Baker, and that she should shut up and be quiet if she wanted to sell the Finney project.

97.     When Skouras learned that Baker had discovered that plaintiff had spoken with Skiena–which effectively revealed the defendants' false representations to Baker--Skouras responded with a torrent of abuse and threats. He renewed his threats to ruin her product and her reputation and made implicit threats of violence, stating in no uncertain terms that he was a "dangerous" person. On November 6, 2012, he telephoned Baker and furiously yelled at her, explicitly threatening her with physical and professional harm.

98.     Skouras' threats included, but were not limited to, warnings that he intended to not only blacklist Baker, but would "crush her career" and "kill" her project. He warned plaintiffs that he was a dangerous and powerful man with a"notorious reputation" and plaintiffs should "just ask around" as his "reputation speaks for itself." He further threatened to call Close, Bazoian, Steven Spielberg, Bruce Berman, and all the various decision makers he claimed he was in discussions with to tell them to forget about the Finney project. He also warned her if she attempted to take action of any kind, he would "find her and that he knew where she lived" and said she now had "one dead dolphin and that he was killing her project and if she didn't watch out it might not be the only thing."

99.     Defendant Skouras' reprehensible actions against Plaintiff Baker inflicted acute, significant long lasting physical and emotional harm as well as severe psychological distress.

100.     To the extent that Skouras stated in November 2012 that he was "done" with plaintiffs, that singular statement was ambiguous at best given the regularity with which he

quit or threatened to quit.

101.    None of the defendants ever formally announced their withdrawal from their contracts with plaintiffs. Instead, by the beginning of December 2012, the defendants simply stopped pretending that they were performing under the contract. This, however, did not however, comply with their outstanding obligations to plaintiffs.

102.    According to the defendants, they had been shopping plaintiffs' script, pitch package, and IP to numerous individuals and studios. Throughout the months leading up to, through, and beyond November 2012, Baker pressed the defendants for the specific identifying and contact information she and the plaintiffs were entitled to under the NDA and as the defendants' client. She also asked for confirmation that these non-party recipients had executed NDAs, and that all of her IP and materials be returned to her. True to form, defendants promised they would follow through on these obligations to plaintiffs but did not and still have not.

103.    Defendants had distributed plaintiffs' IP, and the Finney project as a whole, to countless people and organizations without any effort made to secure NDAs. By placing plaintiffs' IP in the public domain, the defendants severely damaged plaintiffs' ability to continue marketing the Finney project. This is because, in relevant part, investors and producers require assurances that the IP rights in the material they are investing in is legal protected from duplication.

104.    As a result of defendants' conduct, the plaintiffs suffered a variety of damages and economic losses, including, but not limited to those set in the causes of action identified below. These losses and economic injuries were incurred by the plaintiffs, who are Ohio residents, in the state of Ohio.

**CAUSE OF ACTION I**

(Breach of Non-Disclosure Agreement Against All defendants)

105.    Plaintiffs incorporate by reference the preceding paragraphs as if fully restated herein.

106.    Defendants were all parties to an NDA with plaintiffs by which they were obligated, in relevant part, to obtain to obtain plaintiffs' written consent prior to disclosing or discussing the Finney IP or plaintiffs' business plan (collectively the "Finney material") with any third-parties.

107.    The NDA was effective as of July 1, 2011.

108.    By its express terms, the NDA survives and remains in effect regardless of the termination of any contracts or associations between the parties or the timing of any such termination.

109.    The NDA signed by Skouras and BenSalz expressly stated that the Finney IP was being shared by plaintiffs with the defendants for the parties' consideration of a possible partnership or co-production agreement, and that the Finney IP was to be used only in connection with the proposed partnership between plaintiffs and Skouras and his partners.

110.    The NDA further obligated the defendants to identify all persons and entities with whom defendants have had or anticipate having such communications, and to provide plaintiffs with contact information for each such person.

111.    Subsequent to July 1, 2011, the defendants repeatedly shared and discussed the Finney material with numerous individuals and entities (including, according to defendants, Steven Spielberg, DreamWorks, Fox, and various individuals thereat, Village Road

24

Show, Bruce Berman, and others) without first seeking or obtaining plaintiffs' consent and without identifying, before or after such communications, the identities and contact information for each such person and entity.

112.    The defendants further shared and disclosed the Finney material without seeking or obtaining a non-disclosure affidavit or agreement with these third-parties to continue or extend the protections afforded by the NDA.

113.    The defendants repeatedly refused, and have continued to refuse, to identify the individual and entities or provide contact information for them or otherwise document their communications concerning the Finney material, in a blatant and ongoing breach of the NDA.

114.    The defendants' breach of the NDA is ongoing and continuous.

115.    Defendants' knowing and deliberate breach of the NDA has materially compromised and devalued plaintiffs' IP. The introduction of the Finney materials to various persons in the industry without any semblance of protection or documentation means that neither plaintiffs, nor any potential investors, co-producers, or partners, are in the exclusive province of plaintiffs, thus significantly diminishing the Finney materials' market value and impairing plaintiffs' ability to protect, produce or sell the project going forward.

## CAUSE OF ACTION II

### (Breach of Contract Against All Defendants)

116.    Plaintiffs incorporate by reference the preceding paragraphs as if fully restated herein.

117.    Plaintiffs and defendants BenSalz and Skouras entered into a contract when the parties mutually agreed that the Defendants would represent Baker as co-executive producers, partners and agents by using their extensive industry contacts in order to seek the sale, financing, and or production of the Finney project in exchange for a percentage of both the film's budget, in salaries, fees and commission, and any and all future profits.

118.    Plaintiffs and defendant Excel entered into an oral agreement as of October 31, 2011, by which Excel, whose primary business is talent management, would represent Baker as her primary agent.

119.    The parties reconfirmed this relationship repeatedly prior to and after their December 2011 meeting in New York City.

120.    Excel repeatedly assured plaintiffs that they would be presenting Baker with a proposed contract. Despite plaintiffs' many requests for such a writing, and Excel's repeated promises to provide one, no such agreement was executed.

121.    Notwithstanding the above, Excel had clearly and unambiguously mised to proceed as the agent for Baker, and was acting and continued to act in their capacity as plaintiffs' agent.

122.    For example, Excel had begun communicating with studios and independent producers about the Finney project as early as October 2011, and claimed to have continued to do so thereafter. Throughout 2012 the defendants continued to advise Baker to leave the external communications to Close and Excel, and told Baker on multiple occasions that Close and Excel were directly and actively engaged in representing plaintiffs.

123.    The plaintiffs relied on these assurances of ongoing performance by

Excel, and Excel's claims of actual performance in which Excel held itself out to Baker as her agent.

124.    Baker, whose contacts with Mammoth Sound and Vision had brought about a $20M commitment from Mammoth, turned over responsibility for the continued efforts to complete a production deal to the defendants.

125.    The defendants breached their obligations under the contracts by failing to follow up with Mammoth, Arc, and others. Whether the defendants were capable of getting Finney financed and produced, they remained under a duty to use their best efforts to do so and to make an honest effort to adequately represent Baker in a competent manner.

126.    The defendants not only failed to follow through with their end of the contract by not sending Ms. Baker's materials to all of the promised contacts, but breached their duty of fair dealing and good faith to plaintiffs by failing to perform under the contract, and by further disguising and covering up their non-performance by repeatedly claiming to have engaged in good faith performance when they were aware that they had not.

127.    Through this conduct, plaintiffs' ability to market and promote the Finney project was irreparably harmed and concrete offers, such as those from Mammoth and Arc, were lost, resulting in substantial economic damages to Baker and the corporate plaintiffs.

**CAUSE OF ACTION III**

(Fraudulent Inducement and Breach of Fiduciary Duty Against All Defendants)

128.    Plaintiffs incorporate by reference the preceding paragraphs as if fully restated herein.

129.    The defendants were aware that CCC had agreed to fund the Finney project for up to $20M through Mammoth in mid-2011, and Skouras and BenSalz were aware that ATM and Wayde King thought very highly of the Finney project.

130.    Accordingly, the defendants pursued a co-producer/partnership relationship with Baker in which they would also be acting as her agent. To persuade her to enter into such an agreement, they made a series of false statements and promises with the hope and expectation that Baker could be induced into the desired contractual relationship.

131.    In order to induce Baker to contract with them, the defendants represented to plaintiffs that they had significant personal contacts in the film industry, including with VRP, Fox and DreamWorks, and with well-known directors and producers, such as Steven Spielberg. These statements were materially false or misleading.

132.    The defendants repeatedly told Baker that they were affirmatively in communication with these, and other, possible suitors about the Finney project prior to the parties' agreement to contract. These statements were materially false or misleading.

133.    The defendants assured Baker that they could broker a deal for the Finney project in a period of months, and that the deal would be facilitated by their personal connections. These statements were materially false or misleading.

134.    The plaintiffs were convinced to contract with the defendants based on these false promises and misrepresentations.

135.    By virtue thereof, the defendants had, effectively since mid-2011, and continued to have, fiduciary obligations to the plaintiffs as their partners, talent agents, and co-producers, which they have knowingly and continuously violated.

28

136.    The defendants continued to make material misrepresentations to Baker as to their connections, their conversations with these putative connections, and their actions and intended actions to facilitate a deal for the Finney project. By so doing, Baker forewent communicating directly with Mammoth and Arc to advance those discussions or otherwise acting the plaintiffs' best interests as she was relying on the false promises proffered by defendants.

137.    The defendants allowed the offers submitted by Mammoth and Arc to lapse because those offers were less advantageous to the defendants. Under the terms of their contract, the BenSalz defendants entitlement to a finder's fee of ten percent (10%), which was one component of their compensation package, applied only to financing they raised. By allowing the offers from Mammoth and Arc to lapse in favor of pursuing a separate deal with VRP, the defendants elevated their personal interests over those of the plaintiffs.

138.    Defendants' repeated breaches of the NDA also worked a real and substantial injury to plaintiffs and the value of the Finney materials. Their failure to comply with the prior notice and approval provision, as well as their obligation to identify all persons and entities to whom the Finney materials were disclosed was a by-product of the defendants' scheme to prevent Baker from discovering that defendants were lying about their actions.

139.    The defendants' ongoing failure to provide the identities and contact information of the recipients of the Finney materials has continued to present, and has interfered with plaintiffs' ability to reassert control over her IP and to remedy the harms inflicted by defendants' broad dissemination of the Finney materials.

140.    Defendants misrepresented that Baker's extensive presentation and promotional partnership proposal created specifically for Animal Planet/Discovery Kids, was or

would be forwarded to senior executives at the network when such a presentation was not contemplated and had never happened.

141.    Baker was damaged by defendants' false representations, notably in the loss of income and opportunities she had cultivated and garnered for herself prior to, during and after the defendants' fraudulent and reckless actions. Baker was further induced in reliance on defendants' multiple ongoing lies to incur significant financial losses, direct and indirect, lucrative lost opportunities.

## CAUSE OF ACTION IV

### (Civil Conspiracy Against All Defendants)

142.    Plaintiffs incorporate by reference the preceding paragraphs as if fully restated herein.

143.    A civil conspiracy existed between between BenSalz and/or Skouras and Excel to breach the defendants' contracts with the plaintiffs and to breach their respective fiduciary obligations to plaintiffs.

144.    The communications from both Skouras and Excel to plaintiffs establish that the defendants were working in a joint and collective manner such that their conduct could only be understood as the product of an agreement between the defendants. For example, the violations of the NDA, the refusals to cure those violations, and the repeated acts of misfeasance and malfeasance in the defendants' failure to perform under their respective contracts were coordinated by the defendants, who elevated their obligations to each other over their duties of honesty, loyalty, and fair dealing to the plaintiffs.

145.    The shopping of the Finney materials, the lies and deceptive communications to Baker, and the defendants' collective failure to remedy their breaches of the NDA to the present day constitute overt acts in furtherance of that conspiracy and their deliberate participation in the agreement, which were the proximate cause of plaintiffs' injuries.

## CAUSE OF ACTION V

(Tortious Interference with Prospective Business Relations
Against Defendants BenSalz and Skouras)

146.    Plaintiffs incorporate by reference the preceding paragraphs as if fully restated herein.

147.    Baker had continued to communicate with Wayde King after 2012 about, in relevant part, the Finney project and their agreement to continue working together in a number of different ways. Time and again ATM and plaintiffs discussed specific agreements and cross-promotional deals which were reduced to written proposals in 2016 and 2017. These proposals were the product of lengthy discussions between plaintiffs and Wayde King and ATM, who had remained interested in the project over a period of many years.

148.    Ultimately, the 2016 and 2017 proposed agreements with ATM were not executed. Plaintiff understood from her conversations with other principals and knowledgable individuals that ATM was unwilling to proceed as a direct result of Michael Skoursas' malicious interference. Baker came to understand that Skouras, individually and as a member and representative of BenSalz, had interfered by disparaging and maligning Baker, demanding that ATM and King forego any further contractual dealings with plaintiffs.

31

149.     Baker has also come to learn that Skouras has engaged in similarly vicious and vitriolic conduct with other contacts and connections that Baker has developed over time. These included not merely ATM and King, but also Animal Planet/Discovery Channel, Sea World, and various actors and artists. The end result is that Skouras has successfully blacklisted Baker and caused her to be effectively cast out by industry veterans with whom Baker previously had relationships.

150.     Skouras' conduct in this regard was driven entirely by his personal animosity towards Baker and a desire to cause her economic injury. Skouras, who had employed violent imagery while previously threatening to crush her project, has continued to take every opportunity to do so and was successful in that he caused the plaintiffs real and substantial injury.

151.     The plaintiffs were damaged by defendants' false representations, notably in the loss of income and opportunities Baker had cultivated and garnered for herself prior to, during and after the defendants' malicious and abusive actions. Baker was further induced in reliance on defendants' multiple ongoing lies to incur significant financial losses, and lucrative lost opportunities.

**CAUSE OF ACTION VI**

(Violation of Victims of Gender–Motivated Violence Protection Law (VGM)
Against Defendants BenSalz and Skouras)

152.     Plaintiffs incorporate by reference the preceding paragraphs as if fully restated herein.

153.     Michael Skouras' sexual assault of plaintiff on December 20, 2011,

32

violated Section 10-1103 of the New York City Administration Code.

154. By engaging in the acts described herein, Skouras engaged in a crime of violence as defined in New York City Administrative Code § 10-1103

155. **By forcibly grabbing Baker's crotch, vagina, and buttocks, Skouras engaged in criminal conduct, including violations of the following crimes:** forcible touching, in violation of New York Penal Law § 130.52; and, sexual abuse in the third degree, in violation of New York Penal Law § 130.55. These crimes are a Class A and Class B misdemeanor, respectively.

156. Skouras' sudden and violent assault led plaintiff to suffer physical injuries.

157. Skouras' conduct is prima facie evidence that his conduct was motivated by both plaintiff's gender and an animosity towards women.

158. As a result of Skouras' crimes of violence motivated by gender against plaintiff, Baker has been damaged and is entitled to compensatory damages and to attorneys fees and costs.

159. Skouras' actions in violation of the New York City Victims of Gender-Motivated Violence Protection Act were intentional, done with malice, and/or showed a deliberate , willful, wanton, and reckless indifference to Baker's rights, for which she is entitled to punitive damages.

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

**WHEREFORE**, the plaintiffs demand judgment against defendants jointly and severally as follows:

      i.      With respect to causes of action I-IV, compensatory, special, and punitive damages against each of the defendants in favor plaintiffs an amount to be determined at trial;

      ii.     With respect to causes of action V, compensatory, special, and punitive damages against defendants BenSalz and Skouras in favor of plaintiffs in an amount to be determined at trial;

      iii.    With respect to causes of action VI, compensatory, special, and punitive damages against defendants BenSalz and Skouras in favor of plaintiff Baker in an amount to be determined at trial;

      iv.     attorney's fees, disbursements, and costs of the action; and,

      iv.     such other relief as the Court deems just and proper.

Dated:   New York, New York
         October 8, 2020

                              LUMER LAW GROUP
                              Attorneys for Plaintiffs

             By:         _____

                              Michael Lumer, Esq.
                              223 Broadway, Suite 900
                              New York, New York 10279
                              (212) 566-5060